**RICKETTS v. WALLER et al.***
No. 10426.

Circuit Court of Appeals, Eighth Circuit.
Feb. 3, 1936.

F. C. Boehmer, of Lincoln, Neb. (R. A. Boehmer, of Lincoln, Neb., on the brief), for appellant.

Sterling F. Mutz, of Lincoln, Neb. (Edward C. Fisher, of Lincoln, Neb., on the brief), for appellees.

Before GARDNER, WOODROUGH, and THOMAS, Circuit Judges.

GARDNER, Circuit Judge.

Appellees, as partners, initiated this proceeding in the bankruptcy court to cancel and annul a written contract of assignment, which in form assigned, transferred and conveyed to the Lincoln Trust Company an undivided one-third interest in and to the net profits to accrue on certain contracts which plaintiffs had with the Skelly Oil Company, also an undivided one-third interest in certain life insurance policies of Fred J. Waller, Jr., also an undivided one-third interest in 1,586 signboards located in various states named, together with the leases on the places where said signboards were located. Appellees were plaintiffs below, and we shall so refer to them.

Plaintiffs alleged that this assignment was secured from them through threats, intimidation, coercion, duress, and acts amounting to fraud, and was without consideration. The matter was tried before the referee in bankruptcy, the Lincoln Trust Company having in the meantime become a bankrupt. It appears from the findings of the referee, or the undisputed evidence, that at the times in question, plaintiffs were engaged in the business of building, maintaining, and renting signs and signboards located in various states, and had been so engaged for several years; that the Lincoln Safe Deposit Company and the Lincoln Trust Company were corporations, with their principal places of business in Lincoln, Nebraska, and that they were both adjudged bankrupt July 6, 1932, in the United States District Court, District of Nebraska, and that L. A. Ricketts was the duly appointed, qualified, and acting trustee in bankruptcy for said companies; that the Lincoln Trust Company, before adjudication, along with its affiliate company, the Lincoln Safe Deposit Company, was engaged in making real estate loans and selling securities; that in 1927 plaintiffs went to the president and manager of these companies, seeking a loan of $50,000, and to secure same executed an assignment of all the contracts which they had obtained from the Skelly Oil Company and gave chattel mortgages on their signboards and personal property, together with an assignment of the life insurance of Fred Waller, Jr., and certain other mortgage securities. The loan was made in the name of the Lincoln Safe Deposit Company, and bonds were issued against the loan, in which the deposit company was designated as trustee, and the bonds were sold to a large number of investors. This original loan was increased from time to time, and plaintiffs paid off from time to time the bond issue, and new issues were executed. This practice was followed until September, 1931, at which time the loan had been reduced to $92,500, the loan having been about $162,500. None of the outstanding bonds were due until March 1, 1932, and there had been

*Rehearing denied March 30, 1936.

no default in the payment of either interest or principal, but at this time plaintiffs needed additional money to finance the Skelly contract, to pay labor, and certain outstanding bills. The trust company had promised to finance plaintiffs, and had done so up to this time, and had received in full payment of all commissions due and services rendered up to that time, the sum of $17,733.30. At this time plaintiffs had a credit on the books of the trust company of $7,000, which was known to the trust company and its officers, but was not known to plaintiffs, payments due plaintiffs on their contracts being made from time to time to the trust company, and the officers of the trust company concealed this fact from plaintiffs.

When plaintiffs applied for additional funds to finance their business, they were advised by the manager and president of the companies that they did not wish to extend the loans unless plaintiffs would assign a one-third interest in the Skelly contracts and net profits therefrom, and in 1,586 signboards and leases on the ground where same were located, and a one-third interest in said life insurance policies on the life of Fred Waller, Jr., not as security, but absolutely; that in fact the loan committee of the company wanted a one-half interest in said properties, but that the manager and president felt that a one-third interest would put over the loan, and plaintiffs were told that if they did not care to do this they must get the loan financed elsewhere. Attempts were made by plaintiffs to secure funds elsewhere, but because the security was of such character and financial conditions were so bad at that time, it was impossible for plaintiffs to secure financial aid elsewhere, and the managing officer of the trust company knew this when the assignment was demanded. Plaintiffs offered the trust company 25 per cent. of the net profits arising from their contracts with Skelly Oil Company, but this offer was refused, and after further negotiations it was agreed to increase the loan from $92,500 to $95,000. The outstanding bonds were then called in, and new bonds were issued in the amount of $95,000, and either substituted to the previous bondholders for the old bonds, or sold to new purchasers. For this service, and for servicing and financing plaintiffs in their business, the trust company received the assignment in question. Profits from these Skelly contracts, a one-third interest in which was in form absolutely

assigned by this instrument, were very lucrative, and at the time of hearing the loan of $95,000 had been reduced to $30,000 and was rapidly being paid off. The signboards described in the assignment were erected at a cost of $250,000, and the Skelly contracts called for payments in the net sum of approximately $271,534, and the principal sum of the life insurance on the life of Fred Waller, Jr., was $65,000.

Mr. Carlsen, who carried on the negotiations on behalf of the trust company, left the company in April, 1932, and thereafter no attempt was made by it further to assist plaintiffs in financing their business, and shortly before the filing of petition in bankruptcy and the adjudication thereon, July 9, 1932, plaintiffs made demand by letter and otherwise that the instrument be canceled.

The Lincoln Trust Company and the Lincoln Safe Deposit Company were in very close relationship, the former company owning all of the stock of the latter company, and the officers of each company were identical with the officers of the other. The loan papers were executed to the Lincoln Safe Deposit Company, and the Lincoln Trust Company assumed to act as agent in selling the bonds and collecting the commissions. The Lincoln Trust Company at no time attempted to assert any rights or claim under the instrument sought to be canceled, nor did it have anything to do with the operation of plaintiffs' business or in securing the Skelly contracts, but acted toward plaintiffs in a trust capacity only, in making loans to them.

The referee found that the instrument was an executory contract given as a commission to the trust company for servicing and financing the Wallers, and servicing the loan on behalf of the bondholders, and that the servicing had not been completed as agreed; that the contract, if of any validity, was for personal services on behalf of the trust company, in which that company and the Lincoln Safe Deposit Company were to furnish plaintiffs considerable sums to enable them to carry on and operate their business and in order to protect the bonds sold and to service the bonds for the benefit of plaintiffs and the bondholders, and the effect of the bankruptcy of the two companies was to render them unable to finance plaintiffs or to service the plaintiffs further with money as needed; and the referee concluded that if the con-

tract was assignable and could have been transferred under section 70(a), of the Bankruptcy Act, 11 U.S.C.A. § 110(a), and passed to the trustee as an asset of the bankrupt company, there was no evidence that the trustee attempted or offered to exercise his option to perform it or to carry it out, and that the bankruptcy amounted to a complete disability preventing performance of the contract, and was equivalent to a repudiation of it. The referee also found that there was a lack of mutual understanding between the parties as to just what the instrument was given for; that the relation of the parties was such that plaintiffs placed the utmost confidence and trust in Mr. Carlsen as president and manager of the company, and relied upon his advice and judgment in connection with the matters under consideration; that Mr. Carlsen had the controlling influence and was required to act with the utmost good faith. The referee concluded as a matter of law that the contract was void for lack of mutuality; that it was made under financial pressure, and exacted from plaintiffs under compulsion of business necessity and under such circumstances as to render it not the voluntary act of the plaintiffs; that the trust company would receive an enormous amount of money under the terms of the contract "way out of proportion in consideration of the small amount of services that the Lincoln Trust Company was to furnish, and in view of the fact that the loan was only increased an additional amount of $2,500.00"; that the inadequacy was so gross as to impress the court that the instrument was given under compulsion; that "in the opinion of this referee, under the facts as shown by the evidence, the inadequacy of the consideration passing to the Wallers, coupled with other inequitable circumstances, entitle them to have the instrument cancelled." The referee accordingly entered order and decree of cancellation.

On petition to review, the lower court held that the findings of the referee were supported by the evidence; that the decree was in accordance with law, and entered its order approving and confirming same. It is from this decree that appellant prosecutes this appeal, urging in his brief that (1) in an action for fraud and coercion, the petition must state particular acts relied on, and by whom and in what manner they were perpetrated; (2) an equity court will not set aside a voluntary contract merely because a party thereto entered into same because of great want of money at the time the contract was made, duress not being established merely by proof that consent was procured by pressure of financial circumstances; (3) mere inadequacy of price, or other inequality of the bargain is not per se a ground to avoid a bargain in equity in the absence of fraud or mistake; (4) executed contracts are those in which nothing remains to be done by either party, as where a grant is actually made and completed, and such a contract requires no consideration.

■ The short answer to the contention that the petition was not sufficiently specific in its allegations is that the sufficiency of the petition was not challenged in the lower court, nor is the question brought to this court by any assignment of error.

■ The other contentions in effect question the sufficiency of the evidence to sustain the decree of cancellation. There was but little, if any, conflict in the evidence. The findings of the referee were approved by the court. In such a case it is the practice of the appellate court not to disturb such findings unless manifestly erroneous. Parrish v. City National Bank (C.C.A.8) 32 F.(2d) 982; Houchin Sales Co. v. Angert (C.C.A.8) 11 F.(2d) 115; Reiss v. Reardon (C.C.A.8) 18 F.(2d) 200; Equitable Cas. & Surety Co. v. Helena Gro. Co. (C.C.A.8) 60 F.(2d) 380; Bachman v. McCluer (C.C.A.8) 63 F.(2d) 580; Levin Bros. v. Davis Mfg. Co. (C.C.A.8) 72 F.(2d) 163; Meyer v. Ritter (C.C.A.8) 268 F. 937. These findings are amply sustained by the evidence, and were not induced by any misapprehension of the applicable law. We therefore accept them as the facts in the case.

It appears therefrom that prior to the negotiations which resulted in the execution of the assignment under consideration. plaintiffs had made an assignment of all the property and property rights therein described, for the purpose of securing their loans. Payments due under the contracts thus assigned were made to the trust company and the trust company knew the exact condition of plaintiffs' account. Plaintiffs thought they were in desperate need of $2,500, with which to pay maturing obligations. They in fact had to their credit with the trust company at that time $7,000, but were not aware of that fact, and it was concealed from them by the trust company, thus further accentuating plaintiffs'

immediate financial stress. While the trust company had undertaken to finance the plaintiffs and had done so from time to time, it took advantage of plaintiffs' dire necessities, and demanded as a condition to making an advance of $2,500 an out-and-out assignment and transfer of a one-third interest of all of plaintiffs' property and assets. Profits from the contracts assigned were very lucrative; the signboards had cost plaintiffs $250,000, and the contracts called for payments in the net sum of approximately $271,534. In addition to this, there was assigned one-third of the principal sum of $65,000 life insurance of one of plaintiffs. There was also other property assigned. The court did not definitely find the value of the contracts assigned, but did find that they were very valuable. Conservatively, the value of the property and rights assigned exceeded $100,000. If this was not an out-and-out bonus for the loan of $2,500, it was for a service in connection with the handling of the refunded loan, and the referee found that the inadequacy of the consideration was so gross as to shock the mind of the chancellor.

The issue is elaborately briefed on either side, but we think it is completely covered by the decision of this court in Winget v. Rockwood, 69 F.(2d) 326, 331. There is a somewhat similar situation there presented. We there said:

"The contract was so unfair and unconscionable as to shock the conscience of a court of equity. It gave Foshay and his company over $177,000 in money and property for the service of selling $90,000 worth of notes. Plaintiff says this contract was extracted from her through duress, coercion, threats, intimidation, and undue influence. The test, as we have observed, is what was the condition of her mind as the result of the threats, coercion, intimidation, and undue influence. The condition of her mind is, therefore, a fact which is alleged in the complaint and admitted by the motion.

"In 2 Pomeroy's Equity Jurisprudence (3d Ed.) § 948, the author says: 'Whenever one person is in the power of another, so that a free exercise of his judgment and will would be impossible, or even difficult, and whenever a person is in pecuniary necessity and distress, so that he would be likely to make any undue sacrifice, and advantage is taken of such condition to obtain from him a conveyance or contract which is unfair, made upon an inadequate consideration, and the like, even though there be no actual duress or threats, equity may relieve defensively or affirmatively. * * *'

"As has already been observed, there was no consideration for this contract by which this stock was transferred to Foshay. Standing alone, inadequacy of consideration is not necessarily evidence of fraud or undue influence, but it is a material element where the party was under the influence of another, and it is doubtful whether he was a free agent. Accepting as true the allegations of the complaint, we are of the view that it is fairly clear that these conspirators took an undue advantage of the plaintiff's situation and circumstances and obtained from her an unfair and unconscionable contract. * * *

"The contract by which Foshay deprived the plaintiff of this stock is such as to shock the conscience of the man of the street and the right-thinking business man."

No person with any business experience and of ordinary judgment would have entered into this contract, unless impelled by dire necessity. The parties were occupying a relation of confidence, so that agreements between them should be subjected to close scrutiny. It is manifest in this case that the trust company took advantage of plaintiffs' necessities and distress to obtain this unfair advantage over them, and to extract from them this unconscionable agreement. We cannot countenance, much less approve, the conduct which resulted in the execution of this assignment. Plaintiffs were, in our opinion, entitled to the relief granted. The decree appealed from is therefore affirmed.