CITIZENS' NAT. BANK IN WAXAHACHIE
v. CITIZENS' NAT. BANK OF
WAXAHACHIE et al.
No. 4731.

District Court, N. D. Texas, Dallas Division.
Jan. 29, 1935.

Clark & Rice, of Dallas, Tex., for the motion.

Locke, Locke, Stroud & Randolph and Maurice Purnell, all of Dallas, Tex., opposed.

ATWELL, District Judge.

This is a suit for $75,190.16, brought by the plaintiff as the assignee of certain assets of the defendant bank, and as the holder of an indemnifying promissory note in the sum of $200,000. On January 2, 1931, the Citizens' National Bank of Waxahachie, finding itself in distress, sold to the plaintiff all of its properties and assets, both ledger and nonledger, consisting of cash on hand, and in its vaults, balances with correspondents, notes and other evidences of indebtedness, bonds, warrants, and securities, banking house premises, and other real estate owned, and all other properties of whatsoever kind and character and wherever situated, however evidenced, "to protect and compensate party of the second part (the plaintiff bank being the party of the second part) for the liabilities herein and hereby assumed by it, and party of the first part hereby agrees to properly transfer such assets by endorsement, or by execution of any instrument necessary to make such conveyance effective, but such assets so transferred shall be divided into two classes, one of which shall be known and herein referred to as 'class A' assets, the other of which shall be known and hereafter referred to as 'class B' assets, a complete and detailed list of each being hereto attached. * * *"

The class B assets aggregated the sum of $213,052.31. These were items which the plaintiff bank did not care to place in its active assets, "and while title thereto is vested in the party of the second part, it is understood and agreed that such assets shall be held as collateral to secure payment of that certain promissory note of the party of the first part, in favor of the party of the second part, in the sum of $200,000.00 of even date herewith, due and payable on demand. * * *" The class A assets aggregated the sum of $1,580,503.15, and were estimated to be solvent and accessible, while those listed in class B were thought to have a problematical or indeterminate value. "And the consideration of the party of the first part's executing its promissory note, above referred to, is that of offsetting and covering any loss in the class B assets in excess of the present capital structure of the party of the first part." Upon the failure of the party of the first part to pay the note, if payment was demanded, at the maturity date, or at any subsequent date, it was agreed that "full, final, and complete title to, and ownership of, all of class B assets shall then pass to the party of the second part, in which event the value of such assets shall be determined by a committee of three persons, one to be selected by the party of the first part, one by the party of the second part, and the third by the two so chosen, which committee shall appraise the class B assets to determine their then reasonable cash value, and the value thereby determined shall be applied as a credit on the said first party's note of $200,-000.00, * * * and the party of the first part obligates itself to promptly pay the balance that is then due thereon." The contract provided that the plaintiff should have

possession of all of the assets and the right to sell, compromise, or settle any or all of the property, "but no compromise of any evidence of indebtedness herein transferred and conveyed, for less than its face value, or sale of any real estate for less than the carrying value thereof, as shown by the books of the party of the first part, shall be made without notice to and granting party of the first part, the privilege of purchasing, within ten days, such assets at the compromise or sale valuation." The right of transfer from class A to class B, or from class B to class A, was likewise given. "It is hereby specially declared by the party of the first part that it fully intends to protect party of the second part against loss by reason of the liabilities herein and hereby assumed, and this contract and agreement shall be liberally interpreted to that end, but such protection against loss shall not exceed the amount of $200,000.00, as evidenced by the note of the party of the first part, herein referred to." There was also a provision with reference to the assumption of liens and the payment of taxes, which was left optional with the party of the second part, but if any such items were paid the party of the first part was to reimburse.

The plaintiff bank assumed all of the liabilities of the defendant bank as shown by the ledgers at the time of the consummation of the transaction, save and except "the liability of the party of the first part to its shareholders on account of their capital stock investment." "When the party of the first part has effected settlement of its obligation of $200,000.00, if demand for such settlement was made, then and in that event the party of the second part agrees and obligates itself to transfer and reconvey to the party of the first part any and all of the class B assets, including the cash collected, that then may remain therein." It was also stipulated that "party of the first part obligates itself to proceed without delay after the consummation of this contract and agreement to formally vote itself into liquidation and terminate its active banking business."

The whereases in the beginning of this agreement exhibit discovery by the national bank examiners of losses of various substantial amounts and slow and doubtful paper which could not be liquidated and converted into money, "which losses and doubtful assets aggregate an amount in excess of the capital stock, surplus and profits of said party of the first part, creating, in the judgment of the directors of the party of the first part,

an acute situation in its affairs, it likewise being the judgment of said directors that it would not be possible at this time, nor within the near future, to collect in full an assessment upon the shareholders, and that an attempt to do so now would probably seriously embarrass the party of the first part, * * *" and that it was the judgment of the directors of the party of the first part that "it will be manifestly to the interest of its shareholders and to the Waxahachie community generally, and more especially to the depositors of the said party of the first part, to liquidate its affairs under a plan that will insure full protection to each depositor, * * *" and that such proceedings would "thereby assist in liquidating the party of the first part's affairs."

This agreement was attached as an exhibit to, and made a part of, the plaintiff's petition, which, by appropriate allegations, followed the steps of its handling of what had been transferred to it during the past four years, in accordance with the provisions of said contract, and the seeking of the amount sued for as the deficit arising out of its transaction with the assets of class A and class B.

The defendant bank and the other defendants, who are members of the liquidating committee of the defendant bank, present with considerable earnestness their motion to dismiss. They claim that the transaction between the two banks was an out and out sale, and that the suit cannot be said to be one which comes within the jurisdiction of the national court, since all of the parties are residents of Ellis county, Tex. They rely upon the case of First National Bank in Oklahoma City v. Harris (C. C. A.) 27 F.(2d) 117, 124; City National Bank v. Fuller (C. C. A.) 52 F.(2d) 870, 872, 79 A. L. R. 71.

A careful study of the agreement between the two institutions results in the conviction that what took place on January the 2d, 1931, was not a completed transaction. What took place at that moment was hurriedly accomplished and was for the purpose of preserving the community from an impending disaster. The contract was hastily drawn, but it seems to me, when read in its entirety, it discloses, beyond debate, the intention of all of the parties to make use of this method for the liquidation of the stranded or stranding bank, and that the transfer from the old to the new was for the purpose of allowing the new to work out, eventually, by the addition of new money, and perhaps

the added sinew of local confidence, what would take some time, and what the old could not accomplish.

This is shown by a phrase in the second whereas, "it likewise being the judgment of said directors that it would not be possible at this time, nor within the near future, to collect in full an assessment upon the shareholders, and that an attempt to do so now would probably seriously embarrass the party of the first part."

In paragraph 8 of the agreement, this "shareholders' liability" is again referred to. The language is not at all apt, but it evidently means the liability of the shareholders. These references negative any thought that either of the parties to the transaction were of the opinion that the liquidation of the bank, in the sense that there remained nothing else to be done, was accomplished by the transfer to the new institution. Everyone was of the opinion, as evidenced in the contract, that the "winding up" of the affairs of the old bank would take some time, and that the agent for accomplishing this was the new bank. The liability of shareholders in the old institution might be asserted, and become a live matter, if and when the new institution had been unable to work out of the assets, which were transferred to it, sufficient funds to wholly discharge the $200,-000 indemnifying note. That day has now come. All of the days that have passed between the time of the change and the bringing of this suit have been devoted to this particular object. Sufficient funds not having arisen from the liquidation of the assets, the assertion of liability on the note is now properly pleaded, and, if a judgment is secured by the plaintiff, an assessment will probably be levied against the stockholders of the old bank for its payment. Taylor v. American National Bank (D. C.) 2 F.(2d) 479.

The state of the law at the present moment, as to the jurisdiction of the national court, is that it has jurisdiction of "all cases commenced by the United States, or by direction of any officer thereof, against any national banking association, and cases for winding up the affairs of any such bank. * * *" 36 Stat. 1087, 1091, Act March 3, 1911, Judicial Code, § 24 (16), 28 USCA § 41 (16). Prior to that, the right of the national bank to enter the national courts had devious complexions. There was a time when they could come in because they were national banks. Later, such privilege was denied. Then there were statutes giving them the

right of entry because their affairs were in the hands of some officer of the United States. Finally, and at the present time, the law is as above stated.

 Like most suits the final difference between the contenders centers around a phrase which is somewhat elusive. Such suits as are brought by receivers of banks, by trustees, or by others against banks, which would deplete the fund that might be used for the liquidation of its affairs, suits for assessment, are all, plainly, within that phrase of the statute which allows a case for "winding up the affairs of any such bank," to be tried in the national court. Weeks v. International Trust Co. (C. C. A.) 125 F. 370; Birdsey v. Commercial National Bank, 143 Ga. 627, 85 S. E. 881; International Trust Co. v. Weeks, 203 U. S. 364, 27 S. Ct. 69, 51 L. Ed. 224; Davis v. McFarland (C. C. A.) 15 F.(2d) 612; Barons v. First National Bank (D. C.) 28 F.(2d) 615; Moulton v. National Farmers' Bank (D. C.) 27 F.(2d) 403; Bell v. Kelly (D. C.) 54 F.(2d) 395; Chabot v. McRae (D. C.) 7 F. Supp. 113; Wyman v. Wallace, 201 U. S. 230, 26 S. Ct. 495, 50 L. Ed. 738; Auten v. U. S. National Bank, 174 U. S. 125, 19 S. Ct. 628, 43 L. Ed. 920; Guarantee Co. v. Hanway (C. C. A.) 104 F. 369; Irons v. Manufacturers' National Bank (C. C.) 17 F. 308; Studebaker Corporation v. First National Bank (D. C.) 10 F.(2d) 590; Speckart v. German National Bank (C. C.) 85 F. 12; Wichita National Bank v. Smith (C. C. A.) 72 F. 568; Crum v. Patterson (C. C. A.) 64 F.(2d) 263; Neely v. Planters' National Bank (D. C.) 48 F.(2d) 266; Bank of America, etc., Ass'n v. U. S. National Bank (D. C.) 3 F. Supp. 990; Lake National Bank v. Wolfeborough Sav. Bank (C. C. A.) 78 F. 517.

The above cases exhibit the effort of the litigant to either come in or keep out. Sometimes the court held that it was a contest for the "winding up" of the affairs of a bank and sometimes it was not so held. So the cases do not help us very much. They rather aggravate the quandary by offering to us many examples both in and out of such "winding up" process.

Some of the language of the instant contract would lead one to think that what happened on January 2, 1931, between the two institutions was a completed transaction; that it was final, and without any further grist to grind. Contracts, however, like persons, are taken in their entirety. When so taken, the agreement under scrutiny is, it

appears to me, a prescription for the curing, in the most satisfactory way, of the ills that had reached the danger point with the Citizens' National Bank of Waxahachie. The treatment outlined in the prescription extended over much time and had as its object the "winding up" of that institution. That being true, the jurisdiction of this court is beyond question, and the motion must be overruled.