## KOENIG v. OSWALD et al.
### No. 10341.

Circuit Court of Appeals, Eighth Circuit.

Feb. 14, 1936.

La Roy O. Schaumburg and John H. Windsor, both of Boonville, Mo., for appellant.

W. H. Martin, of Boonville, Mo. (Luman Spry, of Fayette, Mo., on the brief), for appellees.

Before GARDNER, WOODROUGH, and VAN VALKENBURGH, Circuit Judges.

WOODROUGH, Circuit Judge.

This suit was in the nature of a creditor's bill brought under section 3117, Revised Statutes of Missouri, 1929 (Mo.St. Ann. § 3117, p. 1946) by the receiver of the Boonville National Bank against Frank C. Oswald and his son Estil F. Oswald to set aside conveyances of lands made by the father to the son and to subject the lands to the lien of an unsatisfied judgment obtained by the receiver against the father. There was federal jurisdiction because the suit was a step in winding up the affairs of the national banking association. 28 U.S.C.A. § 41(1); Hanna v. Consolidated School Dist. No. 1 of Henry County, Mo. (C.C.A.) 78 F.(2d) 374; Citizens' Nat. Bank in Waxahachie v. Citizens' Nat. Bank (D.C.) 9 F.Supp. 513. The trial of the case resulted in a decree for the defendants, and the receiver has appealed.

It appears that Mr. Frank C. Oswald, who was sixty-six years old at the time of the trial in August, 1934, was reared on a farm in Cooper county, Mo., near Boonville, and had carried on stock farming there all his life. He had accumulated over 800 acres of farm land in the county, all free and clear of encumbrances and had a home place in Boonville also unencumbered, about 35 acres in extent. He "bought and sold live stock and kept the animals on his farms to graze and to feed" and he also bred and raised some livestock. His family included his wife and three sons and two daughters. His oldest son, Estil, worked with his father in the business described, and lived upon one of his father's farms known and referred to as the Lamine farm. It was a farm of 340 acres that Mr. Frank Oswald had bought in 1901 for $17,000, and upon which he spent upwards of $10,000 for buildings and improvements to builings in the years 1923 and 1924. The next son, Herman, lived at his father's home in Boonville and also assisted in his father's business. Neither of the young men assumed to be in business for himself but all of the real property stood of record in the father's name and all the livestock was purchased and sold in his name. The only bank account for the business was the account which the father had at the Boonville National Bank. All of the receipts from the farming and livestock business were deposited in that account and all disbursements were checked out of it—both the young men being authorized to sign their father's name for that purpose.

Mr. Frank Oswald had a high standing in the community and good credit at the bank. He held himself out to be the absolute owner of the farm lands and of the livestock and equipment on them. He had never given any intimation to the bank or any of its officers that he owed either of his sons any money on any account. On the contrary, the property statements on his behalf for credit with the bank represent that he was not indebted. The statement concerning the value of his lands was that they were worth about $75 an acre in December of 1930, and December of 1931, and the value put on his home place in Boonville at the same time was $25,000. One of his brothers was a director of the bank and he was himself a stockholder and the bank had for years extended him credit on his own note and without collateral. He borrowed money constantly from the Boonville bank for running the farms and the livestock business and became indebted to the bank to the bank's full limit for a single customer and remained heavily indebted up to the time of the bank's failure. He says that "while Estil was with me he made all sorts of money while times was good when he first started out, but the last, since 1929 and 1930 we all lost money on the farm. I expect our business amounted to nine or ten thousand dollars a month, buying and shipping stock and one thing and another."

The bank failed in June, 1932, and from then on Mr. Frank Oswald was pressed for payment of the indebtedness and at first honestly endeavored to comply. He says, "I shipped all the live stock I could spare," "shipped what I had," and "paid closer than I should have," and at the same time he and his sons tried to raise money by mortgage on his real estate. He sent his sons to different places to try to raise funds to pay the bank—to the bank in St. Louis where he had on occasion deposited the proceeds of cattle shipments and to a man in the real estate business in Boonville and to others. "I told them (the sons) that I would mortgage every thing I had to raise the money. I spent from the time the bank closed until December undertaking to raise the money. I could not borrow it." The next year, on June, 1, 1933, the receiver of the

bank recovered judgment against him on his past-due indebtedness in the sum of $22,316.53, no part of which has been paid, notwithstanding execution duly issued and returned unsatisfied, and nothing can be collected unless the lands he has conveyed to his son Estil are subjected to the lien of the judgment.

It appears that after the failure of the bank and while the father and his two sons were so honestly striving to raise money to pay the bank's debt the son Herman came in contact with a lawyer in Fayette, Mo., who informed him that under the law of Missouri an insolvent debtor had the right to prefer creditors. There was a family conference of the father and sons and the two brothers of Mr. Frank Oswald at which Herman explained what he had heard from the lawyer and it was decided that Mr. Frank Oswald would transfer all his property, real and personal, to his brothers and his sons. Estil says that was the first time he heard of the plan of conveying the real estate to him, and testifies: "At that family conference Herman said he had told Mr. Spry (the Fayette lawyer) and he said that papa would prefer his creditors as far as his money would go and he saw that he could not pay the bank and pay us too, and he said that if that was the law he preferred to pay us." Mr. Frank Oswald's youngest son, Henry Oswald, was probably present at the family conference. He was living at his father's home, but was not a stock farmer like Estil or Herman. He had worked a while in Chicago and was an accountant. After the family conference referred to, he says that his two brothers and his father and two uncles and his stepmother "went with me" to the lawyer's office in Fayette. He went to help in making the transfers. Estil says: "He (Henry) had had more experience in things of that sort than we had ever had, Herman and I."

So assisted by the son Henry and the lawyer, Mr. Frank Oswald deeded two of his farms to his brothers, two parcels of land to his son Herman and all the remainder of his property, including the Lamine farm and all of the personal property thereon and the home property in Boonville, to his oldest son, Estil. The consideration recited in the transfers to Estil was $8,500 for the Lamine farm, $9,861.06 for the home property in Boonville, and $2,930 for the personal property.

As soon as the transfers were made, the father returned to his home and continued to live there with his family as he had before. He testified, "I am still living in the same property that I was living in when the deeds were made. I think he said we could live there, that it was the understanding I should have a home there. Estil said that." Such was apparently his unstudied first answer to questions. He made what he did conform to what he says they intended to do. Later in his testimony he qualified this by saying, "I don't think there was any sort of an understanding that I would be taken care of before the deeds were made out. I am sure of that. I am just so certain that I could almost swear to it that before there was nothing said." "But you could not quite swear to it?" "Yes, I will. After you recollect my memory so long, I will, I know it was; there was nothing said before."

Likewise as to the transfer made to the second son Herman, the father and the son Herman came to an understanding that the rents from the property transferred should be used for the benefit of the father and his family, and they have been. The properties which were deeded to the brothers of Mr. Frank Oswald were forthwith rented to Mr. Frank Oswald's sons Herman and Henry, and the farm and livestock business was continued thereon in the name of Frank Oswald as before, until his lost credit compelled the boys to use their own names in the business.

Upon the transfers being recorded, the son Herman advised the receiver for the bank that "he guessed the bank could not collect" anything on the father's debt. Accordingly, after judgment obtained and execution returned unsatisfied, the receiver brought this suit against the father, the father's wife, and the eldest son, Estil, charging in two of the counts that the transfers were made while Frank C. Oswald was insolvent for grossly inadequate consideration with intent to hinder, delay, and defraud creditors, as both the father and the son well knew at the time. The defense pleaded was: "That on the 1st day of March, 1921, the father and son Estil entered into a partnership in the breeding, growing and marketing of live stock, and farming; that said partnership continued to the 1st day of March, 1930; that books of account were kept between them and an annual settlement of accounts was

made between them; that on the 1st day of March, 1930, said partnership was dissolved whereby all livestock, machinery and cash on hand in bank was turned over to the said Frank C. Oswald, and it was then and there determined that the property and interest in the partnership turned over by Estil to his father amounted to $1,716.65 cash in bank and $13,287.50 livestock and machinery." It was further alleged in the answer that after March 1, 1930, Estil had worked for his father under a contract made between them for $100 per month and his living expenses up to the date of the transfer on December 30, 1932, managing "certain farm lands" and "superintending certain of the stock growing interests belonging to the said Frank C. Oswald." It was alleged that the debt of the father to the son had been thereby increased $3,300. Compound interest was added, and the claim was that the father owed the son a total of $21,291.06 on the date of the transfer and that the value of the properties transferred equaled the debt.

This appeal presents no substantial dispute about any questions of law. The statute of Missouri has been frequently passed on by its Supreme Court and it is settled that an insolvent debtor has the right to prefer and pay one of his creditors, though such payment exhausts his resources and leaves him without means to pay any others. Burston v. Fennewald, 222 Mo.App. 128, 2 S.W.(2d) 824; Citizens' Bank of Hayti v. McElvain, 280 Mo. 505, 219 S.W. 75. A father may give a valid preference to a son, Burston v. Fennewald, supra; but the relationship of the parties to a transfer which defeats the just claims of other creditors is a circumstance to be considered and given due weight in determining the good faith of the transaction. Such a transaction must be closely scrutinized by the court, where fraud is charged by defeated creditors. Barrett v. Foote (Mo.Sup.) 187 S.W. 67. There must be clear and satisfactory proof that there was a valid and subsisting debt. If any part of the debt relied on as consideration for the transfer is fraudulent or fictitious, it will taint the whole transaction and avoid the sale in favor of the creditors. Munford v. Sheldon, 320 Mo. 1077, 9 S.W.(2d) 907, and cases there cited. If the consideration for the transfer was grossly inadequate, the same result must follow, and likewise, if there was a secret

trust or interest reserved to the grantor. Munford v. Sheldon, supra.

The real question is whether there was clear and satisfactory proof that will stand close scrutiny and convince (1) that Estil's father owed him $21,291.06 on December 30, 1932; (2) that the value of the real and personal property transferred at that time was commensurate with the debt; (3) that the transfers were made in good faith. The father and son assumed the burden of proof, and our inquiry is whether they sustained it.

They testified that the transfers were made in good faith and that the lands were of the values specified as the consideration in the deeds and Estil, at least, said his father owed him the $21,291.06. It is pressed upon us that there was testimony concerning the good reputation of Frank Oswald and his boys in their community and "their absolute reliability." But we are confronted at the outset with the representations in the bank statements made to obtain money and credit from the bank to the effect that Frank Oswald had no debts outside the bank debt, and we contrast that representation with the claim that he owed so much that it took his whole estate to pay the outside debts with nothing for the bank. The representations to the bank that the farm lands were worth $75 an acre, contrasted with the valuation of $25 an acre they have now put on them to sustain the transfer. The representation as to the value of the home place in Boonville for the purpose of obtaining credit, $25,000. The change to justify the transfer to $9,861.06. It also appears that Estil made a property statement to obtain credit from another bank to enable him to carry on business after the transfer of the farm to him in December, 1932. In that statement he represented the Lamine farm to be worth $17,000. His explanation is that the banker suggested the figure of $17,000, and although he (Estil) thought it was too high, the banker wrote it down without asking him any question. The banker testified to the contrary, that he questioned Estil and Estil answered as shown by the statement he signed. In another statement for obtaining credit made by Estil to the Boonville bank he represented that he had good accounts owing to him amounting to $6,000. He says he had in his mind the debt his father owed him (claimed on the trial to have been $21,291.06). He explains, as before, that

the banker put it down that way. In other words, one banker from whom he borrowed wanted him to falsely depress his assets and the other wanted him to falsely exaggerate them. But the statements were his statements, and it is his testimony we must pass upon. The testimony of the parties must be weighed with due regard to their interest in the suit.

The claim that Estil's father owed him $21,291.06 in December of 1932 rests entirely upon the statements of the father and son. They assert that the indebtedness resulted from two contracts which they say were made between father and son, not evidenced by any writing between them, and concealed from the father's creditor, not only by passive concealment, but by the affirmative representations referred to.

(1) The gist of the claim as to the first of the contracts is that during the years when "they made all sorts of money while times was good" from 1921 until 1929 and 1930, the father and son were in equal partnership in the livestock and farming business and that shortly after the tide turned (that is, in March, 1930) the father bought out all the assets of the partnership and agreed to pay his son one-half of the amount which they estimated the assets were then worth. Estil says that the amount for which his father so obligated himself was $15,004.15.

(2) As to the other contract, the claim is that after the father had bought out all the partnership assets, he hired the son at a monthly wage of $100 a month and all the expenses for himself and family, to run the business. An additional debt from father to son of $3,300 was claimed to have accumulated under this arrangement.

The total $21,291.06, was made up of the items $13,287.50, $1,716.65, and $3,300 and compound interest at 6 per cent. added.

In so far as the story is that the father hired his son to work for wages and did not pay him, it might, standing by itself, afford very slight handle to lift up and pry into. Such claims are often made, and when the witnesses are corroborated or unimpeached, no ground exists to refuse to sustain them.

But the inquiry whether the parties terminated their long-settled business arrangements and the inquiry whether the father bought or took over livestock and farm machinery from the copartnership at a price of $26,575 on the 1st of March of 1930, find more relevant facts and circumstances to be taken into consideration, and we will review those which have determined our conclusions.

The testimony concerning the arrangement between Estil and his father under which Estil lived on the Lamine farm since 1921 and reared his family there reflects that there was some kind of a partnership arrangement that had been orally agreed upon between them and continued with some modifications through the years. It contemplated that the partnership should carry on farming and buying and selling and feeding and grazing livestock. That out of the proceeds of its activities it should pay all of Estil's living expenses for himself and his family, including their automobiles and clothing and everything, and $300 a year, and should pay the father $1,088 for the use of the Lamine farm by Estil. After the payment of the expenses of the business and those charges, the profits of the partnership, if any, were to be divided evenly between the father and the son Estil. No duration was fixed, and from year to year as the business was carried on all necessary payments were met by checks drawn on the father's bank account, the bank account being in turn replenished by borrowings from the bank on the notes of Frank Oswald. There were included among the notes upon which the bank's receiver obtained judgment, renewals of notes that went back as far at least as 1928, and the only fair inference from the testimony is that they included the borrowings made to provide funds to carry on the business of the partnership. On March 1, 1930, there were over $20,000 of such notes to the bank outstanding.

The first inquiry is whether there was any reason why the father should terminate the partnership relation with the son Estil on that date and take on himself the entire burden of the business and such a heavy debt that he had no means of paying. He had reached the limit of his borrowing credit at the bank and had failed in health so that he was practically confined to his room. He makes no attempt to suggest any reason why he should at that particular time have undertaken to buy up the partnership assets. Estil says there was talk of his brother Herman's going on the Lamine farm about that time, but nothing came of that, and so the alleged termination of the partnership and

taking over of the assets by the father must have occurred, if at all, out of a clear sky, without any credible cause or reason suggested by either party.

The date of March 1, 1930, is important to the inquiry. Estil's claim is that on that date "Dad and I were up there (on the Lamine farm)," and that they then classified and valued the livestock and property on the farm and found the total to be $26,575, and Estil put the items and that total figure down in his book under the heading: "Est. on hand March 1, 1930." ("Est." meaning estimated.) From the description of the business that has been given, there can be no doubt that the numbers of the livestock that would be found on the farm would vary greatly at different times. Constant buying and selling was part of the business. The entry of March 1, 1930, was the largest estimate of property on hand found in his book, so that date must be identified with the alleged transaction in order to bring the amount of the debt to Estil up to the amount of his claim.

We think it significant that although Estil fixes the date of the alleged transaction on March 1, 1930, and the amount which he says his father agreed to pay him at $15,004.15, no such date or amount seems to be prominent in the recollection of the father. The trial court observed that the father, although "crippled" and an invalid at the time of the trial, was "mentally alert." The father's version as to the date was "I think he (Estil) started to work for me about 1930." And in his testimony about what the amount was that he agreed to pay Estil in 1930, he says, "I left it to my sons and to my brothers to figure the value of the obligations I owed them." "At the time of the settlement (in 1930) I think I owed him (Estil) $19,000.00, something like that." "I think from about the time he went to work for me (alleged to be March 1, 1930) I owed him $19,000.00. I guess it was $17,101.85"; "When we dissolved (the same date, March 1, 1930) I think I owed him between twenty-two and thirty-three thousand dollars." "I think I owed Estil somewheres around seventeen, eighteen or nineteen thousand dollars up to 1930."

We next inquire what overt acts there were to indicate that the two transactions asserted and relied on actually took place on March 1, 1930, and our search of the record reveals no such overt acts. After March 1, 1930, Estil was in the same control, management and possession of the property at the Lamine farm as he had had for years, and he was making the same use of the bank account which had been derived, to such great extent, from money loaned by the bank. We think it a circumstance of significance that, although Estil claims to have had a system for keeping a book record of his business transactions during the years from 1921, he produced no entry or notation of any kind recording any such transaction between himself and his father as the sale claimed to have taken place on March 1, 1930.

The claim that he went to work for his father for wages on the same date can hardly be dissociated from the claimed selling out of the assets. At least many of the same observations apply to it. There was no apparent cause or reason for it; there was no overt act to make it tangible, and, though Estil's so-called books of account afforded the main reliance of the defendants in the lawsuit, no entry of any kind is found in his book indicating that he was ever working for wages.

But in June of 1930, some three months after it is claimed that the father bought out all of Estil's interest in the assets on the Lamine farm and went so deep in debt to Estil for it, Estil made a property statement for credit to the Boonville National Bank, and in that statement he declared that a one-half interest in 22 mules and horses, 202 head of cattle and 250 head of hogs belonged to him. The inventory of the property on the Lamine farm recorded in Estil's book as of date March 1, 1930, was substantially similar, and there is no question but that the same property was referred to in both lists and that he was then claiming that half the property on the farm was his. We note that there is some attempt on Estil's part to explain this away also on the ground that after his father had bought the property on March 1, 1930, he gave half of it back again before June of the same year so that Estil could borrow from the bank. We note also that in October of 1931 Estil made another property statement for credit in which he claimed that he was the owner of the whole interest in 24 horses and mules, 196 head of cattle, 200 hogs, etc., plainly meaning the personal property on the Lamine farm the same as before, and representing that he owned it all. The father says at one place in his testimony: "At the time I

made the conveyances of this real estate (December 30, 1932) I did not own any other property. I did not own any cattle, machinery, nor live stock of any kind. I let Estil have it. * * *" At another place he says: "I think I turned over to Estil what live stock I had on hand December 30, 1932. I guess there were seventy-five cattle maybe, maybe some hogs turned over to Estil." Estil says that the personal property on the Lamine farm was transferred to him by his father on December 30, 1932, for the consideration of $2,930, which was its fair value.

All of the large indebtedness claimed to have accrued to Estil out of the partnership transactions with his father must have been profits arising from the business. The record is clear that at the time Estil went into the partnership he furnished absolutely no capital, and the only thing he could become entitled to would be one-half of the profits, if any, and if there were profits due him there would be a like amount of profits due his father. Apparently the money borrowed from the bank went into the capital of this partnership, but no borrowings are charged against the partnership, nor taken out of its assets before a division, and the gist of the claims relied on boils down to this: That while Estil came out of the partnership with a large amount of money as profits, his father came out without profits, lost all of his capital and his farms and his dwelling and owes this debt to the bank besides. We need not say that it would be impossible for Estil and his father to carry on a partnership business and have such dealings in connection with it that Estil would come out owning not only the father's farm and equipment but his town home besides, with nothing left for the father or the stockholders of the bank that furnished the money on which the business was done throughout. But the account which these parties have given to justify that result and the claims they depend on will not bear close scrutiny. On the contrary, they are conflicting and tax credulity unreasonably. The testimony does not amount to clear or convincing proof either that the father recognized that Estil owned half the property on the Lamine farm on March 1, 1930, ahead of the debt incurred in acquiring the same, or that he agreed to buy it out on that date or that he then, in good faith, obligated himself to pay Estil $15,004.15, or that he then hired Estil at $100 a month and found.

So far as the livestock and personal property on the Lamine farm is concerned, outside of some old farm machinery, it is reasonably clear that it was for the most part honestly applied by the Oswalds upon the debts due the bank. Such is the purport of the testimony of both father and son, and none of such personal property is involved or claimed for the bank in this case.

Much of the argument in this case has concerned so-called "books of account" which it was alleged in the answer had been kept by Estil and "annual settlement of accounts" made between Estil and his father. It appears that from the time Estil went into the partnership arrangement with his father he tried to keep an account of his own business transactions, solely, as he says, in order to know how he stood in the business. He did not attempt to keep the accounts of the partnership. He kept no cash account, no record of deposits, no record of withdrawals from the bank account, and no record of loans for the use of the partnership. He says that his system was to go to his father's home every month and get the canceled checks that had been returned to his father and pick out the ones he had signed himself. From these he made entries in his book. He entered half of the amount of checks drawn by him and indicated on the book what they were for. It is not clear how he kept track of the deposits made to his father's account, or that his books reflected any checks that might have been drawn by the father or the brother Herman for partnership expenses, although both of them were shown to have drawn such checks. But he would, from time to time, add up his items of outgo and items of receipts and strike a balance from them. He claimed that he could tell from his system that after paying the father $1,088 due him each year and paying himself $300 and all his living expense, that half of everything on the farm belonged to him and also one-half of certain sums of money that either were in the bank to his father's credit or ought to be there according to his count. The books were not offered in evidence and we do not have them before us. The father testified, "I never looked over the book in my life." But all that Estil claimed in regard to his accounts was that they showed him to be entitled to a half interest in the personal property on the Lamine farm. It is not claimed that the bookkeeping could or does

92

throw any light on the two alleged contracts that we have considered. There is nothing in them to show that the father bought out the partnership property or that he hired Estil at $100 a month, or any other sum. The personal property was, as stated, substantially all applied by Estil and his father to the bank indebtedness contracted in the partnership business, as the evidence convinces it should rightfully have been. It substantially reduced the amount finally left owing to the bank and reflected in the judgment.

We need not find that there was no debt at all owing from the father to the son Estil at the time of the transfer. There may have been some debt. Indeed it may have amounted to $6,000, as Estil represented that it did in the statement which he made to the bank. But we find no sufficient proof that will stand up under scrutiny and convince that the father owed him $21,291.06 as pretended.

Turning to the matter of the valuation of the lands transferred by the father to Estil, it is clear that very careful, painstaking study of all elements of the values was made by experts who were fully qualified to express the opinions in evidence. The opinions are in conflict. In order to keep down the value of the Lamine farm of 340 acres to $8,500 or below, the fact that the father paid out upwards of $10,-000 for dwelling, tenant house and betterment of buildings thereon as late as 1923 or 1924 has to be reconciled. It was not shown that the money was spent unwisely or that the buildings could be duplicated for much less. A strong impression is created that the lands as they stood with those improvements were worth far in excess of $8,500. The values of town property in Boonville were rendered uncertain by economic conditions and the valuation of $9,861.06 upon the acreage in question was not so grossly disproportionate as was the valuation put upon the farm lands. Still it was far below any estimate that the Oswalds had ever made upon it, and the testimony does not convince that full and fair value was allowed for it in view of its adaptability to subdivision.

Manifestly, the valuation was arbitrarily figured down to $1.06 to fit in with the whole scheme of the transfer to his own family of everything in the world that Frank Oswald had. That scheme was not of Frank Oswald's devising. It was not initiated by him nor did it come to a head in the course of any business that he and his son Estil were going on with in the natural courses they had pursued together since Estil was a boy of fourteen. They were working together according to their nature to apply their resources to the debt that they had incurred in their business. The "plan" has unmistakable earmarks of a different turn of mind and it has all of the "badges of fraud" recognized, labeled and weighed by the courts of Missouri.

 We find the two transfers of land from the father to Estil were in fraud of the creditor bank and that the receiver was entitled to have the lands subjected to the lien of his judgment. We have, conformably to the precedents in this court, accorded due weight to the contrary decision of the trial court. L. A. Ricketts, Trustee, etc., v. Fred Waller, Sr., and Fred Waller, Jr., (C.C.A.8) 81 F.(2d) 977, decided February 3, 1936; Johnson v. Umsted et al. (C.C.A.8) 64 F.(2d) 316.

The decree of the trial court is reversed, with directions to enter decree subjecting the lands to the judgment of the plaintiff. Costs in this court awarded to appellant.