JOHN F. BUEHLER, TRANSFEREE OF THE ASSETS OF B & B COMMODITIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; JOHN F. BUEHLER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Buehler v. Commissioner
Docket Nos. 2674-85; 2675-85.
United States Tax Court
T.C. Memo 1987-416; 1987 Tax Ct. Memo LEXIS 413; 54 T.C.M. (CCH) 232; T.C.M. (RIA) 87416; August 24, 1987. *413 P was president and majority shareholder of B & B, a corporation engaged in the trade or business of soliciting customers to trade in commodity contracts. Pursuant to a written agreement, B & B's customers' trades were cleared through RBH, a clearinghouse member of the Chicago Mercantile Exchange. P traded commodity contracts through B & B on an arm's-length basis. P had a large deficit in his trading accounts. RBH, as allowed pursuant to the written agreement, transferred the credit balances in some of B & B's other customers' trading accounts to reduce, inter alia, the deficit in P's trading accounts. B & B, as required pursuant to the written agreement, transferred real property to RBH to reduce, inter alia, the deficit in P's trading accounts. Held: P is not liable, as a transferee of the assets of B & B, for B & B's tax liability. Cole v. Commissioner, 2997 F.2d 174 (8th Cir. 1961), revg. T.C. Memo. 1960-278, followed. Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), applied. Held, further: The transfers made by RBH and the transfer made by B & B were not made primarily for the benefit of P and are not constructive dividends to P. Held, *414 further: the losses incurred by P with respect to his commodity contract trades are capital losses. Paul R. Hodgson, for the petitioner. Thomas J. Miller, for the respondent. FAY
FAY, Judge: These related cases were consolidated for the purposes of trial, briefing, and opinion. In docket number 2674-85, respondent determined that petitioner was liable as transferee of assets of B & B Commodities, Inc., for B & B Commodities, Inc.'s liability for Federal income tax and additions to tax, as indicated below: Corporate Taxable
Liability
Liability for   Year Ended
For Tax
Addition To Tax
Total
October 31, 1978
$ 3,923.00
$ 0    $ 3,923.00
October 31, 1979
157,351.94
13,511.44
170,863.38
October 31, 1980
2,171.32
642.40
2,813.72
TOTAL
$ 163,446.26
$ 14,153.84
$ 177,600.10
In docket number 2675-85, respondent determined deficiencies in petitioner's Federal income tax, as indicated below: Taxable Year Ended
Deficiency
December 31, 1979
$ 54,805
December 31, 1980
233,459
Respondent filed an amended answer in docket number 2675-85 seeking an increase in the deficiency in petitioner's Federal income tax for 1979 from $ 54,805 to $ 229,924. [1] After concessions, the issues are (1) whether petitioner is liable, as a transferee *415 of the assets of B & B Commodities, Inc., for B & B Commodities, Inc.'s tax liability, including liability for additions to tax, (2) whether petitioner received constructive dividends, and (3) whether commodity contracts traded by petitioner were capital assets. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and exhibits attached thereto are incorporated herein by reference. Petitioner, John F. Buehler, resided in St. Joseph, Missouri, at the time the petitions were filed in these cases. Petitioner incorporated J.L. Commodities Corporation on June 1, 1976. On July 7, 1976, J.L. Commodities Corporation changed its name to B & B Commodities, Inc. (hereinafter J.L. Commodities Corporation and B & B Commodities, Inc. will be collectively referred to as "B & B"). At all relevant times, petitioner was president of B & B and the stock ownership of B & B was as follows: Petitioner
52%
Ann Buehler [2] *416 24%
Trusts for the benefit of
petitioner's children
24%
Petitioner received compensation as an employee of B & B equal to a salary plus 10 percent of all commissions earned by B & B. For B & B's five taxable years ended October 31, 1976, to 1980, petitioner's compensation, salary plus commissions, from B & B was as follows: B & B's Taxable
Year Ended
Compensation
October 31, 1976
$ 55,636
October 31, 1977
140,011
October 31, 1978
176,875
October 31, 1979
177,851
October 31, 1980
58,074
B & B forfeited its corporate charter on January 1, 1983. B & B was engaged in the trade or business of soliciting customers to trade in commodity contracts, [3] *418 pursuant to a June 30, 1976, written agreement ("agreement") with Rufenacht, Bromagen & Hertz, Inc. ("RBH"), a clearinghouse member of the Chicago Mercantile Exchange. The agreement established B & B as a branch office of RBH. RBH would, according to the agreement, execute and clear all of B & B's customers' commodity contract trades on the Chicago Mercantile Exchange. The commissions earned on such trades would be split 55% to B & B and 45% to RBH. B & B was solvent as of the date it entered into the agreement and was not rendered insolvent by entering into the agreement. *417 RBH and B & B maintained from one to several trading accounts for each customer. Pursuant to the agreement, B & B and petitioner severally granted to RBH a first lien against any funds otherwise due B & B from RBH in the event that any customer's account had a debit balance. Further, pursuant to the agreement, B & B and petitioner severally guaranteed to RBH the accounts of all of B & B's customers. Petitioner, as president of B & B, did not expect that B & B's grant of the first lien and guaranty of its customers' accounts would be utilized by RBH to cover deficits in petitioner's own trading accounts. Petitioner was B & B's best customer, accounting for approximately 75 percent of all of B & B's business. Petitioner engaged in many "day trades." A day trade occurs when a commodity contract is established and offset on the same day and will be successful or unsuccessful according to the daily fluctuation of the commodity contracts markets. Petitioner engaged in *419 the day trades through B & B to increase B & B's and his income from commissions and to capitalize on the daily fluctuations of the market. Petitioner expected to make a profit in trading commodity contracts, from both day trades and otherwise, for his own account and, from time to time, did make profits for his own account. Petitioner expended, as an employee of B & B and on his own account, between 60 and 70 hours a week tracking the commodity contracts markets. [4] Petitioner paid the same commission on each of his trades as did other customers of B & B. B & B and RBH split the commissions from petitioner's trades just as they split the commissions from other customers' trades. The commissions generated solely by petitioner's trades for B & B's five taxable years ended October 31, 1976, to 1980, are indicated below: B & B's
Taxable
Total
Year Ended
Commissions
October 31, 1976
$ 128,786
October 31, 1977
426,694
October 31, 1978
693,903
October 31, 1979
1,219,316
October 31, 1980
698,275
TOTAL
$ 3,166,974
B & B's taxable income and its taxable income excluding the commissions generated solely from petitioner's own *420 trades, for B & B's five taxable years ended October 31, 1976, to 1980, are indicated below: B & B's
B & B's Taxable Income
B & B's Taxable
Taxable
Excluding Commissions
Year Ended
Income
Generated by Petitioner [5]
October 31, 1976
$ 63,382
($    367)
October 31, 1977
34,236
( 176,978)
October 31, 1978
202,035
( 141,447)
October 31, 1979
509,809
(  93,752)
October 31, 1980
3,995
( 341,651)
During 1979 and 1980, petitioner incurred substantial losses from commodity trading. As of November 30, 1979, the deficit in petitioner's trading accounts exceeded $ 500,000. As a result of President Carter's Russian grain embargo in early 1980, which had a devastating effect on the Chicago Mercantile Exchange, petitioner's deficit in his trading accounts increased by $ 600,000 to $ 700,000. Further, several other customers of B & B also experienced deficits in their trading accounts at this time. In response to the huge deficit in petitioner's trading accounts and the deficits in some *421 of B & B's other customers' trading accounts, and pursuant to B & B's agreement with RBH whereby B & B and petitioner severally guaranteed the accounts of B & B's customers and severally granted to RBH a first lien on all funds otherwise owing to B & B from RBH: (1) RBH transferred the credit balances of some of B & B's customers' trading accounts to reduce the deficits in petitioner's and some of B & B's other customers' trading accounts ("RBH's book transfers"); (2) B & B transferred real estate to RBH having a fair market value of $ 99,427 to further reduce the deficits in petitioner's and some of B & B's other customers' trading accounts ("B & B's real property transfer"); (3) petitioner transferred real estate, his personal home having a fair market value of $ 90,363, to RBH to further reduce the deficits in petitioner's and/or some of B & B's other customers' trading accounts ("petitioner's real property transfer"); (4) petitioner paid $ 42,500 to RBH to further reduce the deficits in petitioner's and/or some of B & B's other customers' trading accounts ("petitioner's cash transfers"). [6] *422 To the extent that RBH's book transfers and B & B's real property transfer decreased the deficit in petitioner's trading accounts, B & B accounted for them as debt due from petitioner. In partial satisfaction of this debt, petitioner paid $ 281,846 to B & B in 1979 and 1980. Petitioner's financial situation did not allow petitioner to pay any more money to B & B: he was broke. Even after all of the above described transfers and the payment of $ 281,846, the deficit in petitioner's trading accounts and the amount of his debt to B & B were still quite substantial. As a result of RBH's book transfers and B & B's real property transfer, B & B was rendered insolvent and unable to pay its income tax liability for its taxable years ending October 31, 1978, 1979, and 1980. Neither party contests that B & B's total tax liability for such years, which includes its liability for additions to tax, is $ 177,600.10, exclusive of interest. This amount has not been paid. Because B & B is no longer in existence, B & B's tax liability is not collectible *423 from B & B. In June of 1980, B & B transferred an automobile with a fair market value of $ 8,500 to Violet Beavers. Violet Beavers later married petitioner. The automobile was used by Violet Beavers' children in a manner having no connection with B & B's trade or business. B & B accounted for the transfer by establishing a receivable due from Violet Beavers. Petitioner claimed short-term capital losses of $ 430,503 and $ 546,303 for his 1979 and 1980 taxable years, respectively. The parties have stipulated that the correct amount of the loss for 1979 was $ 378,896 and for 1980 was $ 546,303. The parties did not, however, stipulate to the character of the losses. In the notice of transferee liability sent to petitioner as transferee of the assets of B & B, respondent determined that RBH's book transfers and B & B's real property transfer made petitioner a transferee of B & B and liable for B & B's unpaid tax liability. In the notice of deficiency sent to petitioner as an individual taxpayer (hereinafter the "individual notice of deficiency"), respondent determined that the yearly excesses of the amount of RBH's book transfers which reduced petitioner's deficit in his trading accounts *424 over the amount of the payments made by petitioner to B & B were constructive dividends to petitioner. These yearly excesses, as determined in the notice of deficiency, amended answer, and stipulation of facts are as follows: Taxable
Statutory
Amended [7]
Stipulation
Year Ended
Notice
Answer
Of Facts
December 31, 1979
$ 89,033
$ 341,917
$ 341,917
December 31, 1980
264,025
264,025
7,719
Respondent further determined in the individual notice of deficiency that the value of the real property transferred by B & B to RBH in 1980 also constituted a constructive dividend to petitioner. The parties have, however, stipulated that only $ 12,497 of the value of the real property was applied by RBH to reduce the deficit in petitioner's trading accounts. Respondent also determined in the individual notice of deficiency that the fair market value of the automobile transferred by B & B to Violet Beavers in 1980 constituted a constructive dividend to petitioner. Respondent also determined *425 in the individual notice of deficiency that the short term capital loss from commodity contract trades claimed by petitioner for 1979 was excessive. As stated earlier, the parties have stipulated to the correct amount of petitioner's 1979 loss from commodity contract trades. Petitioner alleges in his petition that losses from his commodity contract trades for 1979 and 1980 are ordinary losses, rather than short-term capital losses as originally reported on his 1979 and 1980 federal income tax returns. All other issues raised by respondent in the individual notice of deficiency have been unchallenged by petitioner or settled by the parties. OPINION The first issue is whether petitioner is liable for the tax and additions to tax owed by B & B. As previously found, B & B's tax liability is not collectible from B & B. Section 6901 [8] provides a method of collecting from a transferee of property the tax liability [9] of the transferor of such property. Whether a transferee is liable for the transferor's indebtedness is determined under the laws of the state in which the property transfer occurred. Commissioner v. Stern,357 U.S. 39, 42 (1958). Section 6902 provides that in cases before *426 this Court the burden is upon respondent to show that petitioner is liable as a transferee, but not to show that the transferor is liable for the tax. The parties agree that Missouri law is controlling in this case and have stipulated the amount B & B tax liability. Respondent argues that RBH's book transfers and B & B's real property transfer made petitioner a transferee of B & B's property and liable for B & B's tax liability under Section 6901. Petitioner argues, inter alia, that under Missouri State law an insolvent debtor has the right to pay one of his creditors in preference to paying his other creditors and that, to the extent B & B's contract with RBH *427 had this effect, respondent is without recourse against petitioner as a beneficiary of B & B's choice to pay RBH in preference to paying the United States. We hold for petitioner on this issue. Mo. Ann. Stat. section 428.020 (Vernon 1952) provides that conveyances or assignments made with the intent to defraud creditors are void. It is well settled, however, that conveyances and assignments are not void where a debtor merely chooses to pay a particular creditor in preference to paying other creditors. See Land Red-E-Mixed Concrete Co. v. Cash Whitman, Inc.,425 S.W.2d 919 (Mo. 1968); Kinsella v. Gibson,307 S.W.2d 491, 494 (Mo. 1957); Farmers & Merchants Bank of Festus v. Funk,338 Mo. 508, 92 S.W.2d 587 (1936); Van Raalte v. Harrington,101 Mo. 602, 14 S.W. 710 (1890). The Eighth Circuit, to which an appeal in this case lies, has on at least two occasions recognized a debtor's right to pay a particular creditor in preference to paying other creditors. See Cole v. Commissioner,297 F.2d 174 (8th Cir. 1961), revg. T.C. Memo. 1960-278; and Koenig v. Oswald,82 F.2d 85 (8th Cir. 1936). In Koenig v. Oswald, supra at 88, the Eighth Circuit stated: The statute of Missouri has been frequently *428 passed on by its Supreme Court and it is settled that an insolvent debtor has the right to prefer and pay one of his creditors, though such payment exhausts his resources and leaves him without means to pay any others. * * * In Cole v. Commissioner, supra, the taxpayer ("Mrs. Cole") and her husband ("Mr. Cole") were severally liable on a loan, the unpaid balance of which was $ 12,000. The loan was secured by property owned solely by Mrs. Cole. Mr. Cole paid the loan in full at a time when he was insolvent and liable for Federal income tax. Under section 6901's predecessor, the Commissioner argued that Mrs. Cole was a transferee of Mr. Cole by virtue of his paying off the loan for which she was also liable. The Eighth Circuit after quoting the passage from Koenig v. Oswald, supra at 88, reproduced above, concluded: [Mr. Cole] having paid the $ 12,000 to satisfy his bona fide indebtedness on the note, the payment was not in fraud of his creditors under Missouri law and his wife was not liable to assessment as a transferee of his assets under [section 6901's predecessor]. [10] *429 Cole v. Commissioner, supra at 176. The facts of Cole v. Commissioner, supra, are very similar to the facts sub judice. Petitioner and B & B, like Mr. and Mrs. Cole, were severally liable on the same obligation. Petitioner and B & B were severally liable on the same obligation. Petitioner and B & B were severally liable on their guaranty to RBH and their grant of a first lien and Mr. and Mrs. Cole were severally liable on their loan. B & B, like Mr. Cole, was liable for unpaid Federal income tax and chose to pay another creditor in preference to paying the United States.[11] Petitioner, like Mrs. Cole, was the beneficiary of the preferential payment. Under these facts, we follow Cole and hold that petitioner is not liable for B & B's tax liability as a transferee under section 6901. [12] *430 See Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). [13] The next issue is whether petitioner received constructive dividends from B & B. The parties have stipulated that B & B had sufficient earnings and profits to require dividend treatment for all alleged constructive distributions. Respondent argues that petitioner received constructive dividends from (1) RBH's book transfers to the *431 extent they reduced the deficits in petitioner's trading accounts (the "book transfers/constructive dividend issue"); (2) B & B's real property transfer to the extent it reduced the deficit in petitioner's trading accounts (the "real property/constructive dividend issue"), and (3) B & B's transfer of an automobile to Violet Beavers (the "automobile/constructive dividend issue"). We will first consider the book transfers/constructive dividend issue. In Magnon v. Commissioner,73 T.C. 980, 993-994 (1980), we stated Where a corporation confers an economic benefit on a shareholder without the expectation of repayment, that benefit becomes a constructive dividend, taxable to the shareholder, even though neither the corporation nor the shareholder intended a dividend. However, "not every corporate expenditure which incidentally confers economic benefit on a shareholder is a constructive dividend." The crucial test of the existence of a constructive dividend is whether "the distribution was primarily for the benefit of the shareholder." [Citation omitted.]
We will thus consider whether RBH's book transfers authorized by its agreement with B & B were made primarily for the benefit of petitioner. *432 Shortly after B & B's incorporation, it entered into the agreement with RBH. There is no indication in the record that B & B had any business activity other than the business activity conducted pursuant to the agreement. The agreement was essential to B & B's trade or business. As consideration for RBH's entering into the agreement, B & B (1) granted to RBH a first lien against any funds otherwise due B & B from RBH should any customer's trading account have a deficit and (2) guaranteed all of its customers' trading accounts. RBH's book transfers were made pursuant to its first lien on funds it otherwise owed B & B. Thus, we must consider whether B & B granted the first lien primarily for petitioner's benefit. We are convinced that B & B granted the first lien primarily, if not exclusively, for business reasons. The agreement executed by B & B and RBH was a form contract, with RBH's name printed and B & B's name typed in blanks. The agreement established B & B as a branch office of RBH. RBH apparently desired to have, more or less, a similar legal relationship to all of its branch offices. The form contract reflects this desire and indicates that RBH entered into similar agreements *433 with other solicitors on a rather typical or normal basis. At the time B & B entered into the agreement, petitioner, as president of B & B, did not expect that B & B's grant of a first lien would be exercised by RBH to cover deficits in petitioner's trading accounts. Further, it appears as though the granting of a first lien by a solicitor to a clearinghouse is a common business practice in the context of business relationships such as the one shared by B & B and RBH. On the facts presented, we hold that B & B granted a first lien to RBH primarily for business purposes, not primarily for the benefit of petitioner. RBH's book transfers, even those made to reduce the deficits in petitioner's trading accounts, were made pursuant to B & B's grant of a first lien to RBH and were not made primarily for the benefit of petitioner. Accordingly, we hold that petitioner received no constructive dividend as a result of RBH's book transfers. We turn now to the real property/constructive dividend issue. Our analysis of this issue is identical to our analysis of the book transfers/constructive dividend issue. B & B transferred the real property to RBH pursuant to its agreement with RBH, particularly *434 its guaranty of its customers' trading accounts. As stated earlier, the contract was essential to B & B's trade or business. For the reasons we held that B & B's grant of a first lien to RBH was primarily if not exclusively for business reasons, and was not primarily for the benefit of petitioner, we likewise hold with respect to B & B's guaranty of its customers' accounts. B & B's transfer of real property to RBH, even to the extent it reduced the deficit in petitioner's trading accounts, was made pursuant to B & B's guaranty of its customer's trading accounts, and was not made primarily for the benefit of petitioner. Accordingly, we hold that petitioner received no constructive dividend as a result of B & B's transfer of the real property to RBH. [14] *435 We next consider the automobile/constructive dividend issue. Petitioner argues that he paid $ 53,500 to B & B subsequent to the time B & B transferred to Violet Beavers the automobile, which then had an $ 8,500 fair market value. Thus, petitioner apparently argues that he purchased the automobile from B & B. Petitioner has the burden of proof with respect to this issue. Rule 142(a). The $ 53,500 paid by petitioner was not for the automobile but was rather to satisfy his debt to B & B attributable to the deficit in his trading accounts. Accordingly, we reject petitioner's argument. Petitioner makes no other argument with respect to the automobile/constructive dividend issue. We sustain respondent's determination that petitioner received a constructive dividend with respect to B & B's transfer of the automobile to Violet Beavers. The final issue is whether petitioner's losses from trading commodity contracts were capital losses. Characterization of a gain or loss as a capital gain or loss requires the presence of *436 two elements: (1) a sale or exchange (2) of a capital asset. Sec. 1222. Petitioner effectively conceded that the sale or exchange element is here present. Cf. Vickers v. Commissioner,80 T.C. 394 (1983). Thus, our focus is on whether the commodity contracts were capital assets. This Court has on several occasions held that commodity contracts are capital assets. See Vickers v. Commissioner, supra;Muldrow v. Commissioner,38 T.C. 907 (1962); Battelle v. Commissioner,47 B.T.A. 117 (1942); Covington v. Commissioner,42 B.T.A. 601 (194), affd. on this issue 120 F.2d 768 (5th Cir. 1941). Other courts have also held that commodity contracts are capital assets. See Oringderff v. Commissioner,48 AFTR 2d 81-5908, 8- 1-2 USTC para. 9642 (10th Cir. 1981), affg. a Memorandum Opinion of this Court; [15]United States v. Rogers,286 F.2d 277 (6th Cir. 1961); Faroll v. Jarecki,231 F.2d 281 (7th Cir. 1956); Commissioner v. Farmers and Ginners Cotton Oil Co.,120 F.2d 772 (5th Cir. 1941), revg. on other grounds 41 B.T.A. 255 (1940). Petitioner attempts to avoid the application of the above-cited cases under two theories. First, petitioner argues *437 that the commodity contracts are not capital assets within the meaning of section 1221. The burden of proof is on petitioner with respect to this issue. Rule 142(a). Section 1221 defines capital assets as all property, excepting, inter alia, "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." (Emphasis added.) Sec. 1221(a). Petitioner argues specifically that he held the commodity contracts for sale to customers in the ordinary course of his trade or business of buying and selling commodity contracts and, accordingly, the commodity contracts are not capital assets. We reject petitioner's first argument. All of petitioner's commodity contract trades were made through B & B. B & B was not petitioner's customer, but rather petitioner was one of B & B's customers. Petitioner does not argue otherwise. Petitioner would have us look through B & B and RBH to the nameless members of the Chicago Mercantile Exchange who ultimately purchased the commodity contracts petitioner sold and sold the commodity contracts petitioner purchased. Even were we to so look through B & B and RBH, petitioner would fare no better as members of *438 an organized exchange who buy and sell securities from a taxpayer are not the taxpayer's "customers" within the meaning of section 1221(a). See Faroll v. Jarecki,231 F.2d 281, 2887 (7th Cir. 1956); Kemon v. Commissioner,16 T.C. 1026, 1032 (1951). Accordingly, we hold that petitioner's commodity contracts do not qualify for the section 1221(1) exception to the definition of capital assets because petitioner has no "customers." [16]
Petitioner next argues that his commodity contracts are not capital assets pursuant to the Corn Products doctrine. [17] Under the Corn Products doctrine, prima facie capital assets purchased and held by a taxpayer as an integral and necessary part of the conduct of his business are treated as assets other than capital assets, thus making any gain or loss derived therefrom an ordinary gain or loss. However, if a substantial investment motive for the purchase or holding of such assets is present, such assets are treated as capital assets and any gain or loss derived therefrom shall be a capital gain or loss. W. W. Windle Co. v. Commissioner,65 T.C. 694 (1976). *439 The burden of proof is on petitioner with respect to this issue. Rule 142(a). Petitioner was B & B's best customer, accounting for approximately 75 percent of all of B & B's business. Had petitioner not engaged in his substantial trading activities, which generated substantial commission income to B & B, B & B would have incurred losses in its five fiscal years ending October 31 1976, to 1980. Petitioner argues, therefore, that his primary motivation for engaging in his substantial trading activity was to generate income to B & B from which his compensation, salary plus 10 percent of the commissions earned by B & B, could be paid. Even if one of petitioner's motivations to trade commodity contracts were to generate income to B & B from which his compensation could be paid, an examination of petitioner's trading activities indicates that this motivation was, at best, minimal. Petitioner's trading activity generated substantial commission expenses. For B & B's five fiscal years ending October 31, 1976, to 1980, petitioner's compensation from B & B was significantly less than the commission expense *440 incurred from his trading: B & B's Fiscal Year Ended
Commission Expenses
Compensation
October 31, 1976
$ 128,786
$ 55,636
October 31, 1977
426,694
140,011
October 31, 1978
693,903
176,875
October 31, 1978
1,219,316
277,851
October 31, 1980
698,275
58,074
5 year total
$ 3,166,974
$ 708,447
We do not believe that petitioner was motivated to any significant extent to pay $ 3,166,974 in commissions to receive compensation of $ 708,447. We are left with the clear impression that petitioner's trading activities were motivated primarily by his expectation of appreciation in the value of the commodity contracts he purchased. As stated in our findings of fact, petitioner expected to make a profit in trading commodity contracts for his own account and, from time to time, did make profits for his own account. [18] Accordingly, we hold that the commodity contracts are not excepted from the definition of capital assets pursuant to the Corn Products doctrine because a substantial investment motive was present. See W. W. Windle Co. v. Commissioner, supra. Petitioner's losses incurred in trading such contracts are capital losses. [19] *441 To reflect the foregoing and concessions of the parties, Decision will be entered for the petitioner in docket number 2674-85, and Decision will be entered under Rule 155 in docket number 2675-85.
Footnotes
1. Respondent's amend answer relates solely to the book transfers/constructive dividend issue, which issue is discussed infra.↩
2. Ann Buehler was petitioner's wife from November 25, 1959, until divorced on January 15, 1979.
3. Commodity contracts were accurately described in Moody v. Commissioner,T.C. Memo. 1985-20, as follows: A commodity futures contract is an executory contract representing a commitment to deliver or to receive a specified quantity and grade of a commodity during a specified month in the future with the price being designated by the trading participants. Futures contracts are standardized as to the quantity of the commodity, the location, the time of delivery of the commodity and the grade or standards that are acceptable for delivery. In the United States, futures contracts are traded on an organized and federally regulated commodity exchange. The two parties to a futures contract are the seller and the buyer. The seller takes a short position and the buyer takes a long position. Futures contracts are satisfied only by delivery or offset. An offset occurs when a trader executes an equal and opposite position to an earlier position, which eliminates the position in the market. For example, a seller would offset a short position in a given commodity by entering into a long position in the same commodity for the same number of contracts and for the same delivery month. Futures contracts cannot be disposed of in a secondary market, unlike the underlying commodity. Therefore, most are terminated by offset prior to delivery with only a small percentage, 1 to 3 percent, being satisfied by actual delivery. 4. The record does not reflect that this Mr. Buehler took a day off, other than Sunday.↩
5. B & B's taxable income excluding commission income generated by petitioner also excludes the deduction for that portion of petitioner's compensation equal to 10 percent of the commissions earned by B & B generated by petitioner's trades. ↩
6. The record is not clear whether petitioner's real property transfer and petitioner's cash transfers reduced the deficit balance in petitioner's trading accounts only, other B & B customers' trading accounts only, or a combination of the two. 7. In his amended answer, respondent determined that several of RBH's book transfers and petitioner's payments to B & B, which he originally determined in the individual notice of deficiency to have occurred in 1980, occurred in 1979.↩
8. All section references, unless otherwise indicated, are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
9. The transferor's tax liability for which the transferee may become liable under section 6901 also includes additions to tax determined by respondent with respect to the transferor as well as statutory interest. Estate of Glass v. Commissioner,55 T.C. 543, 575 (1970), affd. 453 F.2d 1375↩ (5th Cir. 1972). 10. Section 6901's predecessor, under which Cole v. Commissioner,297 F.2d 174 (8th Cir. 1961), was decided, section 311 of the Internal Revenue Code of 1939, is, as is here relevant, substantially similar to section 6901. 11. B & B entered into a contract with RBH, the effect of which was to pay RBH in preference to paying the United States.↩
12. The relationship of petitioner to B & B, president and majority shareholder, is somewhat different from the relationship of Mrs. Cole to Mr. Cole, wife. However, this difference does not affect our holding, see Land Red-E-Mixed Concrete Co. v. Cash Whitman, Inc.,425 S.W.2d 919, 923↩ (Mo. 1968), where it was held that preferential payments by a corporation to its shareholders or directors in their capacity as creditors could not be voided by other creditors.
13. Respondent did not determine in the notice of transferee liability nor argue on brief that B & B's transfer of an automobile to Violet Beavers made petitioner a transferee of assets of B & B. We therefore do not consider this issue. See Money v. Commissioner, 89 T.C.    (July 6, 1987) (slip op. at 4); Atlee v. Commissioner,67 T.C. 395, 396 n.2 (1976); Hedrick v. Commissioner,63 T.C. 395, 396-397 (1974); Alexander v. Commissioner,61 T.C. 278, 288 n.6 (1973); and Estate of Juster v. Commissioner,25 T.C. 669↩ (1955). 14. We further note that with respect to the book transfers/constructive dividend issue and the real property/constructive dividend issue, that any benefits received by petitioner was qua customer of B & B, not qua shareholder of B & B. Thus, RBH's book transfers and B & B's transfer of property cannot be considered constructive dividends because they were not made with respect to petitioner's stock in B & B. See section 301. In this regard, the record amply supports petitioner's intention and endeavor to repay B & B. Petitioner paid $ 281,846 to B & B and would have paid more if not broke. 15. Oringderff v. Commissioner,T.C. Memo. 1979-93↩. 16. See also Kozikowski v. Commissioner,T.C. Memo. 1986-364 and Huebschman v. Commissioner,T.C. Memo. 1980-537↩. 17. See Corn Products Refining Co. v. Commissioner,350 U.S. 46↩ (1955) and its progency. 18. We note that this finding of fact is based on petitioner's own testimony. ↩
19. This case, as previously indicated, is appealable to the Eighth Circuit Court of Appeals. The Eighth Circuit in Arkansas Best Corp. v. Commissioner,800 F.2d 215 (8t Cir. 1986), revg. in part and affg. in part 83 T.C. 640 (1984), cert. granted   U.S.   (March 23, 1987), recently purported to limit the Corn Products doctrine, which it described as "misbegotten," to its facts. The Eighth Circuit stated, "[w]e believe that the judiciary lacks authority to create exceptions to section 1221 that Congress did not choose to make." 800 F.2d at 221. Since the result reached under our analysis of the Corn Products doctrine is the same as the result which would be reached under the Eighth Circuit's analysis of that doctrine, we are not compelled to and do not apply Golsen v. Commissioner,54 T.C. 742, (1970), affd. 445 F.2d 985 (10th Cir. 1971). See Myers v. Commissioner,T.C. Memo. 1986-518↩.