HARLEY A. LOWE, Administrator of Estate of ISAAC N. LOWE, Appellant, v. E. E. MONTGOMERY and BANK OF BLUE SPRINGS.

Court en Banc, November 24, 1928.

*Burrus & Burrus* and *Gossett, Ellis, Dietrich & Tyler* for appellant.

*Sebree, Jost & Sebree* and *Henry L. Jost* for respondent E. E. Montgomery.

LINDSAY, C.—Appellant, as administrator of the estate of Isaac N. Lowe, deceased, claims title to twenty shares of the capital stock of the Bank of Blue Springs, in Jackson County, which, at the time of the death of Isaac N. Lowe, stood in his name upon the books of said bank. The certificate for these shares was numbered 43.

Defendant E. E. Montgomery claims to be the owner of said shares by purchase from Isaac N. Lowe, and assignment and delivery of the certificate evidencing said shares. The petition, after alleging ownership of the shares by Isaac N. Lowe, alleged that a long time before his death he, for convenience and safety and for the purpose of borrowing small sums of money thereon, left the certificate with defendant Montgomery and the Citizens' State Bank of Blue Springs, of which defendant Montgomery was president; that defendant Montgomery had great influence over the mind of Isaac N. Lowe, by reason of the fact that they were near of kin, and defendant had formerly been a trustee of a portion of the estate of Isaac N. Lowe, left him by the will of his father, A. W. Lowe, and that Isaac N. Lowe's mind had been greatly impaired by the habitual use of intoxicating liquor and he trusted and relied implicitly upon defendant Montgomery; that while said stock remained in the custody of defendant Montgomery, Isaac N. Lowe would frequently from time to time borrow small sums of money on said stock from defendant Montgomery or the bank of which he was president, executing his note therefor and permitting said bank stock to stand as collateral security until the indebtedness was paid; that such transactions were carried on for a long time until shortly before the death of Isaac N. Lowe; that a short time before his death, Isaac N. Lowe paid to defendant Montgomery all the indebtedness he owed him; that defendant Montgomery on learning of the death of Isaac N. Lowe, being in possession of said bank stock, wrongfully and fraudulently wrote an indorsement of transfer of said stock over the signature of Isaac N. Lowe thereon, pur-

porting to transfer said stock to himself. The plaintiff asked cancellation of the transfer, and delivery of the stock to him, and, that, pending determination of the rights of the parties, the Bank of Blue Springs be restrained from transferring said shares on its books. Defendant Montgomery answering, alleged the purchase by him of said stock from Isaac N. Lowe for a valuable consideration, and the assignment and delivery of it to him. He also alleged demand made after the death of Isaac N. Lowe upon the Bank of Blue Springs that the stock be transferred to him upon the books, and refusal of the bank to make the transfer. He further alleged that the Bank of Blue Springs in refusing to make such transfer on its books, was acting at the instigation of plaintiff and was conspiring with the plaintiff to the injury and damage of defendant, whereby he had been deprived of the earnings of said stock and its value to him had been destroyed, and it had been unlawfully converted to the use of the plaintiff and the Bank of Blue Springs; that said stock was of the value of $400 per share, and by reason of the acts of plaintiff and the Bank of Blue Springs he had been damaged in the sum of $8000.

The Bank of Blue Springs by answer and interplea denied that it had wrongfully refused to transfer said shares upon its books; denied that it had conspired with plaintiff to the injury of defendant Montgomery; alleged that it did not know to whom said shares lawfully belonged; asked the court to determine the rights of the parties and order the bank to take such action as was consistent with the rights of the parties as so determined. Defendant Montgomery filed answer to the plea of defendant bank, alleging that the bank was fully informed concerning the ownership of said stock and that its refusal to make the transfer to him was willful and with intent of depriving him of said stock and the value thereof. During the trial it was agreed in open court by all the parties that defendant Bank of Blue Springs need make no defense against the charge of conversion of the stock, but that in accordance with such determination of ownership as might be made by the court, the bank might and would make such orders and entries on its own books as would effectuate the order of the court. No dividends on the stock had been paid out by the bank after the death of Isaac N. Lowe. The judgment of the court was in favor of defendant Montgomery, and the bank was ordered to take up the certificate of twenty shares held by him and to issue to him a new certificate for twenty shares, and pay to him all accrued and unpaid dividends of the stock. The amount of the dividends is not shown. The court, by its order, also expressly reserved jurisdiction to enforce its judgment by other appropriate orders.

The appellant makes four assignments of error, but the first three mean one and the same thing—that the court erred in finding in favor of defendant Montgomery and against the plaintiff. The only other

assignment is that the court erred in permitting defendant Montgomery over plaintiff's objection to introduce testimony to his good reputation.

Isaac N. Lowe died on November 15, 1921, intestate. His brother, the plaintiff, was his only heir at law. Defendant Montgomery was a cousin of plaintiff and of Isaac N. Lowe. The bank stock came to Isaac N. Lowe by the will of his father, A. W. Lowe, who died late in the year 1903. By that will, Isaac N. Lowe was given a farm, which, if he died without issue, was to go to plaintiff. The will also left to him $5000 in money, to be held in trust by defendant Montgomery, for a period of five years. He also was given twenty shares, one-half, of the bank stock owned by the deceased, in the Bank of Blue Springs. This bank stock was to remain unsold for ten years, if the bank continued during that period, and he was to have the income during that period. About 1904, on the petition of Isaac N. Lowe, defendant Montgomery became trustee for the bank stock also, and a certificate was issued to him for the stock. A year or two later, he became dissatisfied with defendant as trustee, and brought a suit to have him removed. He failed in the suit, and the opinion of the Kansas City Court of Appeals, upon appeal in that case, may be seen in 117 Mo. App. 273. At the time of the death of A. W. Lowe, he and Montgomery were close friends. They had organized the Bank of Blue Springs, and were respectively president and cashier of that bank. A short time after the death of A. W. Lowe, differences arose between defendant Montgomery and others connected with that bank, and Montgomery retired therefrom, and about the year 1905 organized the Citizens' State Bank of Blue Springs, of which thereafter defendant Montgomery was president and the active manager.

The $5000 held by defendant in trust for Isaac N. Lowe was turned over to him about the year 1908. About that time, one Thomasen, an officer of the Blue Springs Bank succeeded defendant Montgomery as trustee and the shares of stock in the Bank of Blue Springs were held in trust by Thomasen, until about 1914, when the trust ceased, and the certificate for the twenty shares was issued and delivered to Isaac N. Lowe, the same being the certificate involved in this suit. Isaac N. Lowe was a man of little education, and, as the evidence shows, addicted to drink. He does not appear as successful in the management of the farm mentioned, or of his business otherwise. The payment to him of the $5000 cash appears to have kept him in funds for several years. He then, along about 1917 or earlier, began to borrow money from the Bank of Blue Springs. The certificate for twenty shares of bank stock was signed by him in blank and deposited as collateral security with that bank, and he borrowed money, and gave notes from time to time, at one time owing the bank $1800. In 1918 he owed the Bank of Blue Springs money upon a note, and

also upon an occasion had given several checks to different persons, which the bank refused to pay for want of funds. The Bank of Blue Springs on account of his habits, refused to lend him additional money to cover these checks, and he applied to defendant Montgomery as president of the Citizens' State Bank of Blue Springs. As a result the last named bank loaned him money to settle with the Bank of Blue Springs, and the bank shares were deposited with the Citizens' State Bank as collateral. Thereafter, Isaac N. Lowe gave to the Citizens' State Bank notes successively in renewal of the indebtedness.

The plaintiff called T. W. Kirby, who had been an officer of the Citizens' State Bank from 1911 to 1923, and had him testify as to the entries on the books of the bank, produced in court, and as to the notes given by Isaac N. Lowe to that bank. Isaac N. Lowe's indebtedness was a continuing one, increasing slightly and amounting to $1600 at the beginning of the year 1921. Plaintiff introduced in evidence a cancelled note of Isaac N. Lowe to said bank for $1600, and dated December 30, 1920, due ninety days after date, which the administrator found among the papers of the deceased. It bore the cancellation stamp, or notation, of the bank, that it was paid April 16, 1921, and that was the time payment was noted on the bank register. The evidence shows, however, that it was paid by the execution of a new note for the same amount, the interest being adjusted by Isaac N. Lowe. The new note was not dated April 16, 1921, but bore the maturity date of the note taken up. This new note evidently for ninety day and maturing June 29, 1921, was noted on the books as paid July 1, 1921. It was paid by the execution of a new note for $1665, due in sixty days. This note for $1665, found among the papers of deceased, was dated June 29, 1921, and introduced in evidence by plaintiff. It carried the notation that it was due August 28, 1921. It bore the stamp of cancellation and the notation in writing across the face: ''New note $1000.'' It was discharged by a payment by Isaac N. Lowe and the execution by him of the note for $1000. The new note for $1000 was a note maturing in 120 days, or December 28, 1921. This note for $1000 was paid by defendant Montgomery on November 17, 1921, two days after the death of Isaac N. Lowe, and as contended by defendant, was in payment of the balance of the purchase price of the shares under an agreement made between himself and Isaac N. Lowe on April 6, 1921.

Defendant produced the cancelled check given by him to the Citizens' State Bank in payment of the note for $1000.

The claim of defendant Montgomery was and is, that prior to the transactions mentioned he had of his own money, made loans to Isaac N. Lowe, and that these with accumulated interest amounted on April 6, 1921, to the sum of $3,263.72. He further claimed that on April 6, 1921, he and Isaac N. Lowe made an agreement, whereby Isaac N.

Lowe sold to him the twenty shares of stock, and the consideration agreed upon was the cancellation of the notes held by defendant against Isaac N. Lowe, the payment to Isaac N. Lowe of $100 in cash at the time, and defendant's agreement to pay the sum of $1000 of the indebtedness of Isaac N. Lowe to the Citizens' State Bank. Plaintiff introduced evidence showing that at the time, April 6, 1921, and for some time prior and subsequent thereto, defendant had only small balances to his credit, and also showing that during that period defendant Montgomery was indebted to the Citizens' State Bank in an amount slightly in excess of $4000 on notes, and that $4000 was the limit of the indebtedness which he was permitted to incur to that bank under the banking regulations. Defendant's claim is that because he was not permitted to become indebted to the bank for an additional loan, it was agreed between himself and Isaac N. Lowe, on April 6, 1921, that for the accommodation of defendant, Isaac N. Lowe would give to the bank his own note for the $1000, but that defendant should pay the same. Defendant's offer to testify to the agreement, and to the occurrences connected with it, was rejected on the plaintiff's objection thereto. The certificates for twenty shares was introduced in evidence. The transfer blank on the back bore the signature of Isaac N. Lowe. His signature had been placed there when the certificate was deposited as collateral with the Bank of Blue Springs, and the same certificate was afterwards taken to the Citizens' State Bank as collateral. As introduced in evidence, the transfer blank had been filled out in typewriting, showing E. E. Montgomery as the assignee, the date of transfer as of April 6, 1921 and showing "Bank of Blue Springs" typewritten therein, in the space, and as authorized to make transfer of the certificate upon its books. The certificate also bore the signature of T. W. Kirby as a witness. Mr. Kirby was called as a witness by the plaintiff and testified, when shown this certificate, that it was presented to him and that he signed as a witness to Isaac N. Lowe's signature. He said his recollection was that Mr. Montgomery called him; that he (witness) was in the office of the bank; that Isaac N. Lowe was on the outside of the window; that Montgomery wanted to know if he would witness the signature as being the signature of Isaac N. Lowe; that he replied that he would "in Ike's presence:" that he didn't remember Isaac N. Lowe saying anything at the time, nor recall whether any one else was in the bank at that time. He further testified that he did not remember whether the typewritten matter on the certificate had been written thereon when he signed as a witness. He did not fix the date of his signing as a witness and was not asked by either side to fix the particular time.

Mrs. Ira Minter was called as a witness by defendant. She had been a stenographer in the bank since April 6, 1918; was a second

cousin of Isaac N. Lowe, and also related to defendant. She testified that she wrote in the typewritten part, including the date, and that the date was written in by her at the same time as the other portion; that on this occasion Mr. Montgomery called her to his office, which was just back of the office of the Citizens' State Bank; that she went back in the room, and Mr. Ike Lowe and Mr. Montgomery were in there; that Mr. Lowe had his bank stock and said he was selling it to Mr. Montgomery; that Lowe said he owed Mr. Montgomery some money, and in settling, Mr. Montgomery was to pay $1000 of what he, Lowe, owed the Citizens' State Bank. She testified that on that date, Montgomery gave Isaac N. Lowe $100 in cash; that she asked them what they wanted her to do, and Mr. Montgomery gave her the certificate and told her to fill out the transfer and told her what was to be put in it. Asked if Mr. Lowe said anything about it she answered: "They both agreed to that;" that she took the certificate to the typewriter, filled it out, and brought it back, and that both agreed it was all right; that she heard nothing said about the amount of money Mr. Lowe said he owed Mr. Montgomery, independent of the $1000, but that Lowe "just said that he owed him some money and this was settling up what he owed." She testified that she did not see Mr. Lowe when he came in, but saw him in the office as she described, and that this occurred during business hours, but she did not remember who else was in the bank at the time. She further testified that she saw the money that was paid by Montgomery to Isaac N. Lowe; that when she brought the certificate with the typewritten words, she handed it to Mr. Lowe and he read it over, and handed it to Mr. Montgomery to read it over; that upon her inquiry if that was the way they wanted it fixed, they said it was. Her testimony on cross-examination was that Mr. Kirby's name as a witness was already signed when she filled out the blank, and that she did not know when Kirby signed it; that there may have been some other papers on defendant's desk, but that she did not see defendant give Isaac N. Lowe any papers; saw him give Lowe the money, what defendant said was one hundred dollars, money which she saw lying on the desk and given by defendant to Isaac N. Lowe as she went out of the room.

W. T. McWilliams, who had been the cashier of the Citizens' State Bank since May 1, 1920, was called as a witness by the plaintiff, and testified at some length, having the bank book before him, concerning items of the deposits of Isaac N. Lowe, and the notes given by him. It was shown that Isaac N. Lowe did not make out his own deposit slips; that most of these were entered in the handwriting of defendant —a few by Mr. Kirby, and a few by the witness. He testified that the book showed that on November 17, 1921, the day the note for $1000 given by Isaac N. Lowe was taken up by defendant, defendant's

account showed a deposit of $1000 to the credit of defendant; and showed checks issued of $40.52 and $1000. The $1000 note, produced in evidence, had an indorsement in blank without recourse by the Citizens' State Bank, by T. W. Kirby, vice-president. The note and indorsement bore no cancellation mark. This witness testified that Isaac N. Lowe signed the note for $1000 on August 28, 1921, as an accommodation to defendant Montgomery; that he understood that Lowe did not owe the debt, but that Montgomery had him to do this for his accommodation; that he was present after the note was signed, and was called as a witness to the verbal agreement. His statement is that the understanding or agreement was that the note was signed by Isaac N. Lowe as an accommodation to Mr. Montgomery, and the bank stock was purchased by Mr. Montgomery. He was asked why he was called in to witness this in August, if the bank stock had been purchased in April. The answer was: "I could not tell you, sir." The following then appears:

"Q. Whom did you get your information from that the bank stock had been purchased from Mr. Lowe in April? A. Mr. Lowe, himself.

"Q. Who was there? A. Mr. Lowe and Mr. Montgomery.

"Q. How did you happen to come in? A. I was called in.

"Q. Anybody else there besides you and Mr. Lowe? A. Yes, sir.

"Q. What did Mr. Lowe say? A. He said he would sign this as an accommodation for Mr. Montgomery, that Mr. Montgomery had purchased his bank stock and he paid up $665 of his money and he was signing as an accommodation for Mr. Montgomery."

The evidence shows that in the giving of the notes mentioned, the note for $1000, and the note for $1665, and the prior note for $1600, the interest was paid by Isaac N. Lowe. The evidence also shows that the semi-annual dividend on the stock of four per cent, or the sum of $80, declared by the bank in September, 1921, was paid to Isaac N. Lowe. This was a less dividend than the bank theretofore had been declaring, and plaintiff testified over objection, that afterward, sometime in September or October, he had a conversation with his brother, Isaac N. Lowe, in which Isaac said, referring to the September dividend: "I guess we had better sell it if it ain't going to do any better than that." Plaintiff testified that upon that occasion he told his brother if he wanted to sell, to go ahead and get an offer on it, and he (plaintiff) would give him $100 more than anybody else would offer him for his bank stock and that Isaac "studied a little bit and said he would not sell it for no price." The plaintiff introduced two or three other witnesses who testified that Isaac N. Lowe stated in conversation that he had not sold his bank stock. Defendant introduced several witnesses who testified to statements made by Isaac N. Lowe, subsequent to April 6, 1921, that he had sold his bank

stock, one or two of them stating that he said he had sold it to Montgomery.

The witnesses Kirby and McWilliams were cross-examined as to when entries on the books of the bank were made with reference to the actual time of the transaction. About all we can gather from this is that some times entries were made promptly on the books, the same day the transactions occurred; sometimes, it was several days before the entries appeared. It seems reasonably clear that in the successive notes given by Isaac N. Lowe, each note bore the date of the maturity date of its predecessor; but that the corresponding entries on the books of the bank appeared as of the dates of delivery of the notes to the bank.

The defendant, on the stand as a witness, offered in evidence a series of calculations made by him in lead pencil on both the face and reverse side of a small calendar leaflet. This leaflet bore the printed date of "Friday, June 3, 1921," but the pencil marks thereon showed a notation, "4-6-21." The figures shown on this leaflet, were calculations of two notes, or sums, the one (a note) of $1225, computing interest, and resulting in a total of $2,928.19; the other a calculation resulting in a total of $335.53. The sum of these, $3263.72, was added to the further sum of $1,000 and the further sum of $100, making a total of $4363.72. Above the figures appeared the writing: "I N. Lowe & M." Below appeared: "Stock certificate # 43 Bk. of Blue Springs." Defendant offered this in evidence as an entry or memorandum made at the time of the transaction of April 6, 1921. Upon plaintiff's objection it was excluded. An enlarged photostatic copy of the leaflet is attached to the abstract.

Witness Kirby testified that he had not heard of any individual loans made by defendant Montgomery to Isaac N. Lowe. Defendant offered to testify that the notes held by him individually against Isaac N. Lowe, had been delivered to Lowe at the time of the transaction on April 6, and said notes then destroyed by Isaac N. Lowe. There was no other evidence offered as to the circumstances of any loan made by defendant to Isaac N. Lowe individually or any evidence of the source of the money loaned. There was no evidence as to the source from which defendant Montgomery obtained $100 in cash, stated to have been paid by him to Isaac N. Lowe on April 6th.

According to the testimony, the entry on the books of the bank with reference to the note for $1600, which was dated December 30, 1920, and due in ninety days, showed a notation that the note was secured by bank stock. The next note, the renewal of the note last mentioned, must have been dated March 30, 1921, but its entry, not noted on the books of the bank until April 16, 1921, showed notation on the books that it was also secured by bank stock. The entry referable to the note for $1665, which succeeded the note last referred to, had no

notation of security by collateral, nor did the entry as to the note for $1000 given in August have notation of collateral security. Witness Kirby said he recalled no reason why the latter entry showed no notation as to collateral.

The defendant did not present the certificate to the Bank of Blue Springs for transfer upon the books of that bank until late in November or early in December, 1921, when he presented it to Mr. Thomasen, the president of the Bank of Blue Springs. Thomasen testified that defendant told him he had bought the stock and when asked when he bought it, replied: "You see on the back of the certificate the date." Witness said he told defendant: "That is queer," and told defendant that he had paid Isaac N. Lowe a dividend on the certificate in September, and that Lowe never intimated he had sold the stock. Witness said defendant asked him how much dividend, and he told him $80; that he asked defendant why he had not told any one about purchasing the stock, and defendant replied: "Well, I didn't want Harley to know it" (meaning Harley Lowe, the plaintiff). Mr. Thomasen testified that in December, 1921, the stock was worth $250 a share. Prior to that time he had considered it worth more. It had in some recent years paid dividends of sixteen per cent semi-annually, but in December, 1921, conditions were not so good. One of the witnesses for plaintiff testified to having sold shares of the Bank of Blue Springs for $385 per share. This sale he said was about April, 1920. It appears that during the time Isaac N. Lowe owned this stock, the dividends from the stock were about the only credits he received with the Bank of Blue Springs, and that he checked the money out as desired; and apparently that was about all the business he had with that bank after 1918.

The testimony shows that neither Isaac N. Lowe nor the plaintiff ever married. During the last three years preceding the death of Isaac, they "batched" on the farm. The testimony shows that Isaac N. Lowe drank to excess at intervals at least, from the time his father died, until in the Spring of 1921. The plaintiff testified that in the Spring of 1921, about corn planting time, Isaac said that if he was going to do any farming he would have to quit drinking; that he kept getting it a little smaller: cut it down to taking nothing more than a drink in the morning, and one in the evening when he came in from work; that in July he began to drink again heavily, and continued until the time of his death.

There is no testimony that Isaac N. Lowe was drunk or drinking, at the particular time mentioned by the witness Kirby, when he witnessed his signature on the certificate, nor on the occasion testified to by Mrs. Minter. His condition as to whether he was in liquor at those particular times was not stated.

It will be recalled that heretofore, in stating the allegations of the plaintiff's petition, it was stated that the plaintiff alleged Isaac N. Lowe frequently borrowed money on said stock from defendant *Montgomery*, or from the bank of which defendant was president, and that it was alleged that about —— day of August, 1921, Isaac N. Lowe paid *defendant* all the indebtedness he owed him. After the evidence was closed, and the case was under argument, plaintiff was permitted to amend his petition by striking out defendant's name in the connection just referred to, so that the petition, as thus amended, merely charged that Isaac N. Lowe had borrowed money from the bank and had paid all the indebtedness he owed.

Appellant assigns error in the admission by the court, over objection, of testimony that defendant's reputation for honesty and upright dealings was good. The plaintiff did not attack defendant's reputation. The charge in the petition that defendant had fraudulently written or caused to be written the indorsement of transfer of the stock, did not put defendant's character in issue in such sense as to entitle defendant to introduce this testimony. That this ruling was erroneous, clearly appears from the rulings, and the reasons given and fully set forth, in numerous decisions of this court. [Dudley v. McCluer, 65 Mo. 241; Black v. Epstein, 221 Mo. 286, 305; Orris v. Railroad, 279 Mo. 1; Milan Bank v. Richmond, 235 Mo. 542; State ex rel. v. Allen, 308 Mo. 109, 120.]

Holding as we do that the testimony as to defendant's reputation for integrity and upright dealings should have been excluded, there arises the question whether the judgment should be reversed and the cause remanded on account of that error. In Dudley v. McCluer, supra, the suit was one to set aside a settlement. The plaintiff in that suit was the appellant, and asked that the evidence be reviewed in the case as being one in equity. Without going into the question whether it was an equitable proceeding, this court said because it had been so treated by the parties it would be regarded as a suit in equity, but added, page 242: "Inasmuch as for an error which will be presently adverted to, the judgment will be reversed and the cause remanded, we shall express no opinion as to the correctness of the finding of the court on the evidence." In that case the defendant, respondent on appeal, over plaintiff's objection, and before any attempt was made to impeach his good character, had been permitted to introduce witnesses to testify to his good character. After discussion of that question, and ruling that the testimony was not admissible, the judgment was reversed and the cause remanded, and apparently for the error in admitting that testimony.

The rule that in equity, on appeal, this court may disregard incompetent proof admitted, was not discussed. However, it has been stated many times, that ordinarily, judgments in equity are not re-

versed, or that rarely is a judgment in equity reversed because of erroneous rulings in admitting or excluding evidence, for the reason that the whole record is before the appellate court, and the appellate court will review the evidence, excluding what is incompetent, and consider what is competent, and make its own findings. [Goodrick v. Harrison, 130 Mo. 269; Rice v. Shipley, 159 Mo. 399; Russell v. Sharp, 192 Mo. 270; Morrison v. Turnbaugh, 192 Mo. 427; Hanson v. Neal, 215 Mo. 256, 271; Jones v. Thomas, 218 Mo. 508, 544; Rinkel v. Lubke, 246 Mo. 377; Roberts v. Roberts, 291 S. W. 485, 487.]

Something of the nature of a qualification of the rule is stated in Russell v. Sharp, supra, l. c. 291: "But as it is the rule in this court to review the evidence and find the facts in an equity case when the facts are in dispute, we have not always held that it was reversible error when we have found that incompetent evidence had been admitted, because in most cases we could separate the incompetent from the competent and reach a conclusion from the legal evidence, but we have never meant to say that it was not error to admit incompetent evidence in an equity case or that the finding of the trial court would never be reversed for such error. Whether for such an error the finding would or would not be reversed would depend on the circumstances of the particular case. Sometimes even in an equity case the judgment may be reversed and the cause remanded for a new trial." The similar statement was made in Morrison v. Turnbaugh, supra, l. c. 442, where it was said that in an equity case it is "our duty to consider the decree from the standpoint of whether or not it is right and founded on the competent proof, regardless of questions relating to mere admissibility of evidence. . . . But this does not mean that . . . if the case required it, we would not reverse and remand because of reversible error in allowing proof."

The ruling in Dudley v. McCluer upon the question of admissibility of testimony has been cited many times, with approval; but, we have found no reference to that case as an authority for holding that on appeal in a suit in equity, there should be a reversal of the judgment because improper testimony was admitted on behalf of the party prevailing in the trial court.

In Walther v. Null, 233 Mo. 104, there was a reversal and remanding with directions, in a suit in equity, based upon a review of all the evidence, after discussion of the probable effect of the incompetent evidence upon the mind of the chancellor. In that case it was said that over objection of the plaintiff "a great mass of testimony was introduced, much of it hearsay, loose talk, mere inferences, etc., having for their purpose proof" of certain allegations of the answer, which, it was held, had no proper place in the case. Upon that situation it was said by LAMM, J., l. c. 111: "In an equity suit rulings on evidence are of little or no controlling force on appeal, as a general

rule. That rule is founded on the doctrine that the appellate court tries such case *de novo* in a certain sense. Therefore, if improper evidence go in, we can reject it and no harm results. If proper evidence is offered and excluded, we can consider it when preserved in the record and thus permit ourselves, sitting as a court of conscience, to reach a final and just conclusion despite rulings *nisi* on the admission of testimony. But in a close case, or where a mass of irrelevant and prejudicial proof is allowed, we may never know what insidious effect the improper testimony had upon the mind of the trial chancellor. Such evidence tends to create an *atmosphere* about the case inimical to judicial and intellectual robustness and serenity of judgment. It puts the discriminating powers of the chancellor to a dangerous and unnatural test. It puts an enticing and alluring color in the case that tends to seduce the mind of the chancellor aside from the main-travelled road to ultimate justice. It puts a mote in his mind's eye. It may put a question mark after his decree.''

While there are circumstances connected with this transaction not explained or susceptible of certain explanation under the evidence, yet we conclude that there was competent evidence to support the finding of the court, and we are unable to say its reversal is demanded. The essential charge was that defendant, having the stock in his custody and possession, after the death of Isaac N. Lowe, fraudulently filled in an indorsement to himself. The testimony of Mrs. Minter was competent as was that of witness McWilliams, being testimony as to acts and statements of Isaac N. Lowe and defendant when they were together. Both of these witnesses were cross-examined at length, concerning the circumstances, and their relations with defendant; and Mrs. Minter, especially, as to whether she was under the authority and influence of defendant, as an employee of the Citizen's State Bank of which defendant was president, whether she owed her position to him, and was testifying to things as suggested by him. The chancellor having the witness present before him was in a far better position to judge of her sincerity, and the weight to be given to her testimony, than we are. If he accepted her testimony as true, there was competent evidence to support the finding against the plaintiff. Without her testimony, such finding could not have been made. We will not assume that the reliance of the trial court upon the truthfulness of her statement as to what occurred on April 6, depended upon the incompetent testimony that defendant's reputation for integrity was good, or, that the testimony of two witnesses to defendant's good reputation created an ''atmosphere or put the discriminating power of the court to an unnatural test,'' or diverted the mind of the chancellor from the real issues. Under that view, we conclude the judgment herein should be affirmed.

PER CURIAM:—This cause coming into Court en Banc from Division One, the foregoing divisional opinion by LINDSAY, C., is adopted as the decision of the court. All of the judges concur.