FARMERS & MERCHANTS BANK OF FESTUS, a Corporation, Appellant, v. WILLIAM A. FUNK, ANNA L. BRANDS, J. R. FUNK, KATHERINE FUNK, NELLIE FUNK, DAISY FUNK, H. E. VAUGHN and E. T. MANLEY.—92 S. W. (2d) 587.

Division One, March 10, 1936.

*James Booth* and *R. E. Kleinschmidt* for appellant.

*Terry, Terry & Terry* for respondents.

FERGUSON, C.—This is an equity suit in two counts. The first count is a suit to try and determine title to an undivided one-sixth interest in a tract of approximately 134 acres of land in Jefferson County. The second count seeks a partition of the land. The issue of title on the first count is between plaintiff and defendant Katherine Funk, the title and ownership of the other five-sixth interest in the land not being in dispute. Defendant Katherine Funk alone answered. The cause went on a change of venue to the Circuit Court of Franklin County and the trial chancellor found the issues for de-

fendant Katherine Funk and entered a decree declaring that plaintiff "has no right, title, interest or claim in the real estate described in" the petition, and that defendant Katherine Funk "is . . . the owner" of the undivided one-sixth interest therein in dispute. Plaintiff has appealed.

We first state the situation as shown by the uncontroverted facts. The tract of 134.84 acres of land is a farm known as the "Funk farm." It was owned by defendants, William A. Funk, Anna L. Brands, J. R. Funk, Katherine Funk, Nellie Funk, and Daisy Funk, brothers and sisters and the children and heirs of Christian Funk, deceased, who owned the land at the time of his death intestate. They owned the land as tenants in common, each having title to an undivided one-sixth interest therein. William A. Funk was indebted to plaintiff bank on notes aggregating $3500 secured by deeds of trust on certain real estate, which he owned, in the city of Festus. The undivided one-sixth interest in the "Funk farm" was the only real estate other than this property in Festus that William A. Funk owned. It seems the major part of his indebtedness to plaintiff bank secured by deeds of trust on the "city property" (so referred to in the evidence) was incurred in 1922. In addition to the indebtedness to the bank secured by the deeds of trust on the "city property" he was indebted to it on two unsecured notes in the principal amount respectively of $300 and $275. William A. Funk was called before a meeting of the board of directors of plaintiff bank on "the second Tuesday in May, 1932," and advised that it was the opinion of the directors that the "loan on the city property was not properly secured" and he was "asked to give additional security" and to give the bank a mortgage or deed of trust on his undivided one-sixth interest in the "Funk farm," which he refused to do stating that he "thought" the bank "had ample security." At this time William A. Funk was indebted to other creditors and one unsatisfied transcript judgment was outstanding against him. Shortly thereafter the plaintiff bank caused notice of foreclosure sale on the first deed of trust against the city property to be published. The notice fixed June 4, 1932, as the date of the foreclosure sale. On June 2, 1932, William A. Funk and wife, by quitclaim deed, executed and delivered of that date, conveyed his undivided one-sixth interest in the "Funk farm" to his sister, the defendant herein, Katherine Funk. The consideration was stated therein as: "One hundred dollars and other valuable considerations." This deed was filed for record on the next day, June 3, 1932. The foreclosure sale of the city property did not satisfy the debt, interests and costs, and on August 18, 1932, the bank commenced an action, in the Circuit Court of Jefferson County, against William A. Funk seeking a deficiency judgment. A default judgment for $1043.83 was en-

tered therein on September 15, 1932, and execution issued thereon April 18, 1933. The sheriff levied the execution upon an undivided one-sixth interest in the "Funk farm" as the property of William A. Funk. Such interest was offered for sale at the execution sale on May 13, 1933, and conveyed by sheriff's deed under execution to plaintiff bank upon its bid of $200. Thus the issue in the present suit arose. The plaintiff bank claims title to and ownership of the undivided one-sixth interest of William A. Funk in the land under the sheriff's deed to it and defendant Katherine Funk claims to be the owner of the same undivided one-sixth interest under the quit-claim deed of June 2, 1932, to her.

The object and purpose of this suit is to set aside and cancel the quitclaim deed of June 2, from William A. Funk and wife to his sister, defendant Katherine Funk. It is alleged in the first count of the petition that the deed "was executed . . . without consideration and in order to defraud the creditors of the said William A. Funk, particularly this plaintiff, . . . and was accepted by said defendant Katherine Funk to enable said defendant William A. Funk to defraud his said creditors and . . . said deed is therefore null, void and of no effect." This excerpt from the petition presents the issue—that of fraud or a fraudulent conveyance. The answer of defendant Katherine Funk is conventional. She claims to be the owner of an undivided one-sixth interest in the land "by reason of the quitclaim deed," etc., "and also another one-sixth interest by reason of having inherited the same from Christian Funk" and denies that plaintiff "has any right, title, interest or claim in and to said property."

Plaintiff having charged fraud in the transaction rendering the quitclaim deed void the burden rested upon it to prove it. [Stahlhuth v. Nagle, 229 Mo. 570, 129 S. W. 687; Mansur-Tebbetts Imp. Co. v. Ritchie, 143 Mo. 587, 45 S. W. 634; Jones v. Nichols, 280 Mo. 653, 216 S. W. 962; Gockel v. Gockel (Mo.), 66 S. W. (2d) 867; Gittings v. Jeffords, 292 Mo. 678, 239 S. W. 84.] And in such cases the plaintiff is required to make out his case by clear and convincing evidence. "While fraud may be inferred from facts and circumstances, it is never to be presumed without or against the evidence. And where the transaction under consideration may as well consist with honesty and fair dealing, as with a fraudulent purpose, it is to be referred to the better motive." [Jones v. Nichols, supra; Gittings v. Jeffords, supra.]

We come now to the evidence adduced on the part of plaintiff to sustain its charge that the quitclaim deed from William A. Funk to Katherine Funk was a voluntary conveyance, "without consideration," made with the intent "and in order to defraud the creditors" of William A. Funk and "accepted by defendant Kath-

erine Funk" in furtherance of that purpose and intent. Plaintiff put in evidence, the quitclaim deed from William A. Funk to Katherine Funk; the files and judgment in its action for a deficiency judgment; the execution issued on the judgment with sheriff's return; and the notice of levy and the sheriff's deed under execution purporting to convey the undivided one-sixth interest of William A. Funk to plaintiff. Next plaintiff called as witnesses three of its officers and directors who testified, that William A. Funk was called before a meeting of the board of directors held the "second Tuesday in May, 1932;" that they demanded that he execute a deed of trust or mortgage to the bank on his undivided one-sixth interest in the "Funk farm" as additional security for the loan then secured by deeds of trust on his "'city property;" and that he refused to do so on the ground that he thought the bank had "ample security" for that indebtedness, as related, supra. These witnesses estimated the reasonable value of an undivided one-sixth interest in the land to be $1000. We note here that it appeared in evidence that William A. Funk's two unsecured notes to the bank, one for $300 and one for $275 were paid, apparently before he made the quitclaim deed to his sister Katherine. She paid the $300 note and his wife paid the $275. The youngest sister Daisy Funk married a man named Meyers and they resided on the farm. What income, if any, the farm produced or returned does not appear.

The other proof in the case was the testimony of defendant Katherine Funk who was called as a witness by plaintiff. She testified that for a number of years she and her sister, Nell, lived together "at Oakland about a mile and a half from Kirkwood" in St. Louis County, which county adjoins Jefferson County, the *situs* of the land involved; that she and her sister, Nell, had paid all the taxes on the farm for a number of years and the cost of several items of repair including the rebuilding of two porches, concrete work and a new roof on the house; that for taxes and repairs her sister, Nell, had advanced and paid $842.74 and she had advanced and paid $1064.79, an aggregate of $1907.53; that William A. Funk had never reimbursed them for his one-sixth part thereof and was indebted to them therefor, or in the sum of $318 ($317.92); that she and her sister, Nell, had from time to time loaned William A. Funk, their sister, Mrs. Meyers (Daisy Funk) and her husband, and their brother, J. R. Funk, various sums of money and taken their notes therefor; that at the time William A. Funk made the quitclaim deed to her she held his note in the principal sum of $150 and Nell held his note in the principal sum of $140 (both notes produced); that in addition William A. Funk was indebted to her for the amount advanced by her (check produced) to pay his unsecured note to plaintiff bank in the principal sum of $300 (this makes an aggregate in-

debtedness of William A. Funk to Katherine and Nell Funk, in a principal sum of $908); that she had prior to the making of this quitclaim deed agreed to reimburse her sister, Nell, the amounts she had advanced for taxes and repairs and had spoken to William A. Funk and other of her brothers and sisters who were indebted to her and Nell about making some kind of settlement; that they "had come to the place where there had to be some kind of settlement;" that on the afternoon of June 2, 1932, the day the quitclaim deed was executed, she was "on her way to a tea at Kirkwood" when her brother William and his wife drove up "to the gate of our institution" in a car "there is no further explanation but apparently the witness refers to her place of work and it appears that the ensuing conversation occurred at that place and explains why she did not have access to notes, tax receipts, checks, and accounts which she had at her home and which were produced and referred to during her testimony); that she "got in the car;" that William said he had "driven that afternoon to see some of his other creditors" and "was trying to settle with his creditors;" that she wanted some assurance that she "would be taken care of;" that she did not have the books, notes and accounts so she could compute the exact amount of his indebtedness to her and Nell but that they discussed it and they "approximated the amount" as being "between $850 and $900" (it is evident that only the principal amount was considered, which as we have noted was in fact $908, and no allowance made for interest); that William's wife "first suggested making a deed" for his interest in the land saying "she thought he ought to make a settlement with us;" that she agreed to assume and pay his indebtedness to Nell, being one-sixth of amounts advanced by Nell for taxes and repairs "and the note for $140 and interest" thereon and he agreed to convey his interest in the farm to her in settlement of his indebtedness to her and Nell; that they agreed his interest in the farm "was worth about $1000;" that her action in the premises, and this agreement, was subsequently fully ratified and accepted by Nell who acquiesced in the valuation of "about a $1000" placed on the one-sixth interest; that having arrived at an agreement they drove to Kirkwood and had a Notary Public write the deed and take the acknowledgment; that when the Notary asked the consideration and was advised that they could not state the exact amount thereof he suggested that it would be sufficient to state the consideration as being $100 and then wrote it in the deed as, "one hundred dollars and other valuable considerations;" that at the time she knew her brother was indebted to the bank and other creditors but "did not know how much;" and that there was "no understanding that she would deed the property back to him."

As noted the tax receipts, notes, and checks referred to by the witness were produced, inquired about and viewed and examined by the chancellor. It further appears that accumulated and unpaid interest was not computed in the record which if considered would materially increase the amount of William's indebtedness to his sisters. It was, however, brought out in the course of the cross-examination that no interest had been paid on the $150 note which Katherine held and that $65 in interest had accumulated thereon. The amount of interest due on the $300 note and the $140 note was not mentioned or computed though it definitely appeared that there was accumulated and unpaid interest due on both. The trial chancellor saw these notes, the dates thereof and credits thereon and unquestionably took the interest due into consideration in determining the total amount of the indebtedness. Allowing merely the $65 in interest which was mentioned the total amount of the indebtedness would be $973 and it is certainly a justifiable inference that all unpaid interest considered the amount of the indebtedness would equal or exceed the value of the interest in the land conveyed as estimated by plaintiff's other witnesses and agreed upon by William, Katherine and Nell.

Clearly if the testimony of Katherine Funk concerning the indebtedness be accepted, as apparently it was, by the chancellor who was in a position to pass upon the credibility of the witness, a bona fide indebtedness to Katherine and Nell Funk in the amount of $1000 or more existed at the time William conveyed the one-sixth interest valued at $1000 in settlement and payment thereof.

The testimony of Katherine Funk concluded plaintiff's evidence in the case. Whereupon counsel for defendants stated: "Your honor, I don't think they have made a case" and the chancellor, then addressing counsel for plaintiff said: "I don't think you have made any case, I think he had a right to prefer creditors if he wanted to, and he owed these people approximately what the property was worth. Plaintiff's bill will be dismissed." A decree then followed for defendant Katherine Funk as stated, supra.

As we have observed the chancellor accepted the testimony of Katherine Funk relating to the indebtedness and found therefrom that the transaction was in good faith and in discharge of a bona fide indebtedness of William to his sisters, Katherine and Nell. While in an equity case the appellate court considers the case *de novo* and has authority to weigh the evidence nevertheless when the trial chancellor has decided issues or questions of fact from oral testimony of witnesses appearing before him this court will usually defer to his findings thereon unless such findings, upon the printed record before us, are clearly erroneous or against the greater weight of the evidence. [Fessler v. Fessler, 332 Mo. 665, 60 S. W. (2d) 17;

Fendler v. Roy, 331 Mo. 1083, 58 S. W. (2d) 459; Scott v. Hill, 330 Mo. 490, 50 S. W. (2d) 110; Norton v. Norton (Mo.), 43 S. W. (2d) 1024.] We cannot say on this record that plaintiff has met and discharged the burden of proof resting upon it and that, upon the cold record before us, the finding of the chancellor is against the weight of the evidence. Under the evidence a chancellor may justifiably conclude that the transaction "as well consists with honesty . . . as with a fraudulent purpose" in which event "it is to be referred to the better motive." [Jones v. Nichols, supra.]

Adopting the chancellor's finding that the sisters, Katherine and Nell were bona fide creditors of William, he had a legal right to prefer them over other creditors, if he chose to do so, and discharge his indebtedness to them in preference to other debts. This court said in Stahlhuth v. Nagle, supra: "It is firmly established doctrine in this State that a debtor may prefer one creditor over another, even though the preferred creditor be a relative of the debtor; but in the latter case the fact of relationship is to be considered with the other facts and circumstances."

The case of Kincaid v. Irvine, 140 Mo. 615, 41 S. W. 963, is very similar on facts to the instant case. In that case creditors of William R. Irvine brought suit in equity to set aside a deed whereby William R. Irvine had conveyed his farm of eighty acres to his brother, Jesse Irvine. The conveyance rendered William R. Irvine insolvent and left him owning no property out of which plaintiffs' claims could be collected. Defendant's evidence showed the consideration for the conveyance as follows: that there was a mortgage for $400 against the land which the defendant (Jesse Irvine) assumed and agreed to pay; that William R. Irvine was indebted to Jesse Irvine on a note for $408 which was discharged; that William Irvine was indebted on a note for $291 on which Jesse was a surety and this note Jesse agreed to pay; and that William owed another brother $125 which Jesse agreed to pay. The sum of these items is $1224 which the chancellor found was the consideration for the conveyance of the eighty acres of land. The question of the value of the land was submitted to a jury. Plaintiffs' witnesses placed the value at about $20 an acre or a total of $1600; defendant's witnesses at $13 an acre or a total of $1040. The jury fixed the value at $15.30 an acre or a total of $1224 (the amount of the consideration shown by defendant). This valuation was adopted by the trial chancellor whose finding and decree was for defendant. On appeal to this court the judgment of the trial court was affirmed. This court said: "William R. Irvine unquestionably had the right, under the laws of Missouri, to prefer Jesse Irvine over other creditors. That Jesse Irvine was a bona fide creditor to a certain amount does not admit of cavil." This court then adopts the finding of the trial

chancellor as to the value of the land conveyed and the consideration therefor as claimed by defendant and says: "It turns out that this (the consideration) was full value for the property. No element of fraud is discernible in the transaction." Such was the conclusion of the trial chancellor in the instant case and we find no occasion to differ therewith. Continuing this court stated in the Irvine case: "So long as there is no fraud in the transaction, a debtor in failing circumstances may prefer his kinsman who is his creditor as well as a stranger. While a court of equity will scan the transaction with jealous eyes, preference and relationship alone will not afford sufficient evidence of fraud."

The rule which is approved and followed by the courts of this State is stated at 27 Corpus Juris, page 637, as follows: "The fact that there is a family relationship between the debtor and the preferred creditor does not of itself affect the validity of the preference and is not a badge of fraud. If the debt is valid and no fraud attends the transaction a preference given to a relative or a member of the debtor's family is as valid as if made to any other creditor. . . . A debtor may give a valid preference to his father, his mother, his child, his brother, or his sister. Nevertheless the relationship of the parties to the transfer is a circumstance to be considered in connection with other circumstances and given due weight in determining the good faith of the transaction." [See Stahlhuth v. Nagle, supra; Kincaid v. Irvine, supra; Pew v. Price, 251 Mo. 614, 158 S. W. 338; Mansur-Tebbetts Implement Co. v. Ritchie, supra; and McElvain v. McElvain (Mo. App.), 20 S. W. (2d) 912.] Since the indebtedness in the instant case, in settlement of which the one-sixth interest in the farm was conveyed, was a bona fide, valid indebtedness in an amount equal to or in excess of the value of the property conveyed no inference of fraud arises out of the fact alone of family relationship.

Plaintiff's counsel asked one of the officers of the bank in the course of his direct examination as a witness as to the reasonable value of the "city property" which was sold under foreclosure. Defendants' objection was sustained. No offer of proof was made. Later on the cross-examination of one of the bank officers defendant was permitted over plaintiff's objection to show that the bank after receiving the sheriff's deed purporting to convey to it the one-sixth interest of William A. Funk did not pay taxes for the year 1933. Plaintiff complains that the two rulings on evidence were erroneous and so prejudicial to it as to require a reversal. Citing numerous decisions of this court we said in Lowe v. Montgomery, 321 Mo. 330, 11 S. W. (2d) 41: "It has been stated many times that ordinarily judgments in equity are not reversed, or that rarely is a judgment in equity reversed because of erroneous rulings

in admitting or excluding evidence, for the reason that the whole record is before the appellate court, and the appellate court will review the evidence, excluding what is incompetent, and consider what is competent, and make its own findings." The conditions or circumstances that warrant a departure from this general rule are discussed in Walther v. Null, 233 Mo. 104, 134 S. W. 993. It is said in that case that over the objection of the plaintiff "a great mass of testimony was introduced, much of it hearsay, loose talk, mere inferences, etc., having for their purpose proof" of certain allegations of the answer which, it was held, had no proper place in the case. This court said, the opinion being by LAMM, J.: "In an equity suit rulings on evidence are of little or no controlling force on appeals, as a general rule. That rule is founded on the doctrine that the appellate court tries such case *de novo* in a certain sense. Therefore, if improper evidence go in, we can reject it and no harm results. If proper evidence is offered and excluded, we can consider it when preserved in the record, and thus permit ourselves, sitting as a court of conscience, to reach a final and just conclusion despite rulings *nisi* on the admission of testimony. But in a close case, or where a mass of irrelevant and prejudicial proof is allowed, we may never know what insidious effect the improper testimony had upon the mind of the trial chancellor. Such evidence tends to create an atmosphere about the case inimical to judicial and intellectual robustness and serenity of judgment. It puts the discriminating powers of the chancellor to a dangerous and unnatural test. It puts an enticing and alluring color in the case that tends to seduce the mind of the chancellor aside from the main-traveled road to ultimate justice. It puts a mote in his mind's eye. It may put a question mark after his decree." The controlling and determining issue in the instant case was fraud in the conveyance by William to his sister, Katherine. If the reasonable value of the "city property," which was foreclosed, had any bearing at all on that issue it was at most extremely remote and if competent for any purpose should have been preserved in the record but plaintiff made no offer of proof. We do not perceive the immediate bearing or competence on the main issue involved of the item about the payment of taxes for the year 1933 but certainly it was harmless. We perceive nothing resulting from these rulings that could likely or probably have prejudicially affected the merits of the case or influenced the chancellor's findings.

For the reasons stated the judgment and decree of the trial court should be affirmed. It is so ordered. *Hyde* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur.