Mrs. W. J. KINSELLA, Jr., Appellant,

v.

Robert E. GIBSON and Ruth Gibson,
Respondents.

No. 45887.

Supreme Court of Missouri,
Division No. 2.

Dec. 9, 1957.

I. Frank Rope, Arnold N. Shanberg, Herbert M. Rope, Rope, Shanberg & Rope, Kansas City, for appellant.

Harvey Roney, Kansas City, and Virgil A. Julian, Independence, for respondents.

BARRETT, Commissioner.

This lawsuit is an incident to the marriage, finances, and divorce of Jane Kinsella Gibson, now Jane Kinsella Hughes, and Scott Gibson, particularly as these events have come to affect their respective parents, the Gibsons and the Kinsellas. This is a suit by Jane's mother, Mrs. Kinsella (her husband now being deceased), to set aside a deed from Jane and Scott to Scott's father and mother, Robert and Ruth Gibson. At the close of the plaintiff's evidence the trial court sustained the defendants' motion to dismiss the action for the reasons that the plaintiff failed to prove that the conveyance was without consideration or that it was made for the purpose of hindering, delaying or defrauding creditors, and upon judgment being accordingly entered Mrs. Kinsella has appealed.

At the outset the appellant urges that the court erred in permitting its judgment "to be colored" by matters irrelevant and collateral to the main issue, such as whether Jane was the "real moving party" in instituting and prosecuting the action. But, being a court-tried equity suit, this court considers such evidence as is deemed admissible and excludes from consideration evidence improperly admitted. Hussey v. Robison, Mo., 285 S.W.2d 603, 604. Nor is the case to be determined upon the appellant's failure to file a reply to the respondents' answer (V.A.M.S. § 509.100), there was no motion for judgment on the pleadings (McIntosh v. Foulke, 360 Mo. 481, 228 S.W.2d 757), and the trial court did not treat the fact of the failure to file a reply as having any bearing upon its decision. The court having dismissed the plaintiff's action at the close of her evidence, the question here is whether the plaintiff's evidence made a prima facie case of a fraudulent conveyance, a conveyance made "with the intent to hinder, delay or defraud creditors." V.A.M.S. § 428.020; Coleman v. Alderman, 357 Mo. 758, 210 S.W.2d 994. This important fact, the court's having dismissed the action at the close of the plaintiff's evidence, should be borne in mind throughout, and the opinion upon this appeal should in nowise be considered as an expression or indication of how the case should ultimately be decided upon its essential merits. Oldham v. Wright, 337 Mo. 170, 85 S.W.2d 483. It is the appellant's claim upon this appeal that her evidence "raised a strong inference" that the conveyance was voluntary, that it showed certain "badges" or indicia of fraud and, prima facie, was fraudulent as to her. It is said that there was no evidence of a valuable consideration for the conveyance and that the "failure of an adequate consideration" destroyed the validity of the transfer "regardless of the expressed absence of fraudulent intent."

The background is this: Jane and Scott were married at Independence in 1943. Prior to the marriage Scott had purchased eighty acres of unimproved land on Bundschu Road from the Kansas City Life Insurance Company. He paid $1,000 of the purchase price and gave a $9,000 note and deed of trust to secure the balance. Within two months of the marriage Scott and Jane started building a home on the land—it was completed about a year and a half later, in April 1945. They were to make either quarterly or semi-annual payments on the original mortgage, and these they made for the first year or so with money advanced by their parents. Jane, in testifying for her mother in this case, said, "Occasionally we were helped out by Mr. Gibson's parents and my parents." By 1946 there were numerous judgments and claims, for the "original delivery bills on the children," doctors' bills, drug stores, gasoline filling stations and the like. Then there were numerous bills in connection with the house building, principally sizeable lumber bills. In 1945 Scott embarked upon the contracting business, dirt moving, building ponds and roads, and then he got into the rock quarry business. These ventures were most unsuccessful, consequently there were more debts, $9,000 or more. By 1948 Jane, speaking of the house, said that the mortgage was then six or seven thousand

dollars, taxes were in arrears, "and we had no way in the world to meet the payments or the taxes at that time, and all these other claims were existing; in fact, we were bankrupt, you might say."

So, on January 13, 1948, Jane and Scott conveyed the eighty acres to Scott's father and mother, Robert E. and Ruth Gibson. In 1951 Mr. and Mrs. Gibson sold 52.5 acres of the tract to Mr. and Mrs. Bessmer, leaving 27.5 acres upon which the house and "a lake" had been constructed. The 27.5 acres is the land involved in this suit. Jane and Scott continued living in the house, however, until December 1951, when Jane left and lived in St. Louis until June 1953. In June 1952, she instituted an action for a divorce against Scott. But the following June she returned to Kansas City and lived with Scott another year and on August 19, 1954, obtained a divorce.

In the meanwhile, throughout the years 1946, 1947, 1948 and, no doubt beyond, Jane's parents, Mr. and Mrs. Kinsella, were lending or advancing money to Scott and Jane. Four days after the institution of Jane's divorce suit, on June 13, 1952, Mr. and Mrs. Kinsella brought suit against Jane and Scott for the sums they had advanced or loaned. But it was not until August 19, 1954, that they were given a default judgment for principal and interest in the sum of $27,893.96. On the same day Mrs. Kinsella instituted this action against the Gibsons.

The Kinsellas' suit against Scott and Jane was for the principal sum of $20,289.-68, $5,603.38 of which was advanced between December 4, 1944, and May 9, 1947, prior to the execution of the deed, and more than $14,000 was advanced after the execution and recording of the deed. In this connection Mrs. Kinsella in describing the indebtedness, in her deposition, said that the first item of $1,000 on December 4, 1944, was a loan to Jane in connection with the house, and on April 18, 1945, the next item of $1,000 was a loan "to Jane Kinsella Gibson" also for the house. January 19, 1945, a check for $500 was a loan to Jane,

and on December 24, 1945, a check to Eisel & Eisel for $103.38 was for screens for the house. The next item, March 6, 1946, a check for $2,500 was a loan to "Gibson Contractors, Incorporated," which she said was for the building of the house. On May 9, 1947, there was another $500 check to Gibson Contractors and on May 7, 1948, there was a check to the Columbian National Bank for $11,686.30 and this item "was loaned on a piece of machinery," it was paid to the bank "for the purchase of a mortgage" which was transferred to Mr. Kinsella and released by him and given to Scott and Jane. On June 20, 1950, there was a check for $2,500 which Mrs. Kinsella thought, "just offhand," was a loan on an airplane Scott had purchased. Mrs. Kinsella "thought" that in addition to the $11,-686.30 Mr. Kinsella had "invested" an additional $10,000 in the Gibson Contracting Company as a stockholder from which he had vainly expected some return.

In her deposition Mrs. Kinsella said, in connection with the advances, that she and Mr. Kinsella had made no investigation as to whether the eighty acres was mortgaged, she "thought". Scott and Jane owned it, and, in the words of her lawyer, that it was "clear" and that credit was extended "partially at least" on the basis and assumption of their ownership. Neither she nor Mr. Kinsella had any idea of the value of the land and made no investigation of its value and they did not discuss its value with Mr. and Mrs. Gibson. Neither did they know whether the Gibsons were also advancing or loaning money to Scott and Jane and they did not discuss Scott's and Jane's finances with the Gibsons. In fact, she says, that she did not learn of the 1948 conveyance from Scott and Jane to the Gibsons until about the time she instituted this suit to set it aside, August 19, 1954.

█ As indicated in connection with the court's having decided the case at the close of the plaintiff's evidence, it is our view that the plaintiff's evidence, aside from any question concerning its credibility, made a prima facie case within the meaning of the

statute, and, therefore, it is not necessary to consider in detail all the relevant facts or the applicable rules and demonstrate a result one way or another as if the case had been decided upon consideration of all the available evidence on both sides.

First, as to consideration: The conveyance here was a quitclaim deed, there were no revenue stamps on it, and the recited consideration was "one dollar and other valuable considerations." There was, however, consideration for the deed. As Jane said, "We needed money very badly, and the idea was, his father was going to pay off this existing mortgage and the back taxes and help up out to that extent." The amount of the mortgage wast then six or seven thousand dollars and, in addition, there were the back taxes and "I said they were to pay all of the back taxes and the existing mortgage on the place, and to help us straighten out our affairs. * * * Our debts, as I understood it, to our creditors. * * * The debts we owed, these judgments existing against us." And, finally, she said, "Q. What was the answer to my question as to whether the deed was executed with consideration? A. Yes, sir. Q. With consideration? A. Yes, sir."

■■ The amount of the tax bill does not appear and there is no evidence as to the amount of the debts or judgments to others and it does not appear whether the Gibsons paid these latter obligations. The difficulty with the consideration problem is this: In the beginning Jane said, "Occasionally we were helped out by Mr. Gibson's parents and my parents," but there is no evidence that Jane and Scott owed Mr. and Mrs. Gibson any sum of money when the deed was executed on January 13, 1948. The "help" they received from the Gibsons may have been a gift or it may have been sums comparable to those advanced by the Kinsellas and they may have been loans, but the fact does not appear. A debtor may prefer one creditor over another—including creditor relatives (Van Raalte v. Harrington, 101 Mo. 602, 14 S.W. 710, 11 L.R.A. 424; Farmers & Merchants Bank v. Funk, 338 Mo. 508, 92 S.W.2d 587), but, upon this record, Mr. and Mrs. Gibson were not creditors and the deed was not executed in consideration of any such pre-existing indebtedness. Compare: Peoples Bank of Memphis v. Jones, 338 Mo. 1048, 93 S.W.2d 903. So far as appears the consideration was only the assumption of the back taxes and the note secured by the deed of trust and, as indicated, that was sufficient consideration. But, Jane testified that the value of the land had increased from $150 to $350 an acre since Scott's purchase, and that the value of the 27.5 acres with the house on it was $30,000. It does not appear how much the Bessmers paid for the 52.5 acres or what became of the proceeds, for all we know it may have discharged the mortgage and taxes. In any event, if the 27.5 acres was really worth $30,000 as Jane said, the six or seven thousand dollar mortgage and taxes would indicate an inadequately disproportionate consideration, one subject to some scrutiny. Citizens Bank of Pleasant Hill v. Robinson, 342 Mo. 697, 117 S.W.2d 263; 24 Am.Jur., Sec. 100, p. 250. In describing the transaction in full, in addition to the consideration, Jane said, "We needed money very badly, and the idea was, his father was going to pay off this existing mortgage and the back taxes and help up out to that extent, and return to us a portion of it free and clear, that we could live on. * * * He was going to help us out of our financial difficulties, and since it was impossible for Scott to retain any of this in his name because of these lawsuits, * * * because of these existing judgments, and he was going to put this in his name to protect it for us so we would continue to have a place to live, but we still could not have it in our name; in other words, he was going to hold it for us." This point is not briefed and argued and, the validity of any such oral agreement aside, if a part of the consideration and transaction embodied a reservation for the benefit of the grantors that, of course, is a factor to be considered. Bigelow, Fraudulent Conveyances, Sec. 2, p. 260.

Mrs. Kinsella did not prosecute her suit to judgment until after Jane's and Scott's divorce, the default judgment was entered on August 19, 1954. However, the suit was instituted on June 13, 1952, four days after the divorce suit was filed, and part of the indebtedness to the Kinsellas was incurred in the years 1944, 1945, 1946 and 1947, prior to the conveyance in 1948. It does not appear what if anything the Gibsons knew of Jane's and Scott's indebtedness to the Kinsellas or even of this transaction except as it is related by Jane. See: Emlet v. Gillis, Mo., 63 S.W.2d 12. And, in response to the court's inquiry, Jane repeatedly disclaimed any intent to "cheat and defraud" creditors. She said, "To my knowledge it wasn't to cheat them, no. * * * I have never done that intentionally in my life." It is not necessary to examine and characterize the disclaimer, or to consider the necessity and meaning of "cheat and defraud" in connection with the statute. V.A.M.S. § 428.020; Chrisman v. Zeysing, Mo., 209 S.W.2d 144; 3 Pomeroy, Equity Jurisprudence, Secs. 970–972, pp. 872–876. Jane's definitions and conclusions could be naively unrealistic. This was a conveyance from a most improvident son and daughter-in-law to the son's parents, to say that they were insolvent is indeed an understatement, and they were left in possession of the property. Considering what we have indicated concerning the consideration and all the circumstances, there was present a certain number of "badges" or factors relevant in actions of this type bearing upon "the intent," the force of which should be negatived if not repelled before this case is disposed of upon its essential merits. As illustrative and advisory see Matz v. Miami Club Restaurant, Mo. App., 108 S.W.2d 975; Castorina v. Herrmann, 340 Mo. 1026, 104 S.W.2d 297; Wrigley v. Wrigley, 345 Mo. 207, 131 S.W.2d 989; First National Bank of Monett v. Vogt, 344 Mo. 284, 126 S.W.2d 199.

As we have attempted to make plain throughout, this is not to adjudge the case upon its ultimate merits in any respect, it is to say, however, in the presence of so many unexplained factors and in the absence of certain available evidence, that this court may not finally and confidently determine the essential merits of the cause and, with deference, that the trial court should not have done so upon this record. Accordingly the judgment is reversed and the cause remanded.

BOHLING and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court.

All concur.